C. Alan POWELL, Individually, and on behalf of all others similarly situated; Tory Dunlap, Individually, and on behalf of all others similarly situated; Lee Antonio Smith, Individually, and on behalf of all others similarly situated; David Evans, Individually, and on behalf of all others similarly situated; Plaintiff,

v.

Sheriff Jacqueline BARRETT, Fulton County, State of Georgia; Sheriff Myron Freeman, Fulton County, State of Georgia; Chairperson Karen Hanel, Fulton County Board of Commissioners; Member Robb Pitts, Fulton County Board of Commissioner; Member Tom Lowe, Fulton County Board of Commissioners; Member Emma I. Darnell, Fulton County Board of Commissioners; Member Nancy A. Boxill, Fulton County Board of Commissioners; Member William Edwards, Fulton County Board of Commissioners, a/k/a Bill Edwards; City of Atlanta, State of Georgia, Defendants.

No. 1:04–CV–1100–RWS.

United States District Court,
N.D. Georgia,
Atlanta Division.

July 5, 2005.

Barrett S. Litt, Paul J. Estuar, Litt, Estuar, Harrison, Miller & Kitson, LLP, Los Angeles, CA, Charles B. Pekor, Jr., Daniel Eliot DeWoskin, Pekor & DeWoskin, Atlanta, GA, James Patrick Claiborne, Augusta, GA, Lynn E. Cunningham, George Washington University, Washington, D.C., William Charles Claiborne, III, Washington, DC, for Plaintiff.

Theodore Howard Lackland, Lackland & Associates, Atlanta, GA, for Defendants—Sheriff Jacqueline Barrett and Sheriff Myron Freeman.

Julianne N. Belaga, Kimberly Williams D'Haene, Richard Lance Robbins, Sidney Leighton Moore, Teresa Wynn Roseborough, Sutherland, Asbill & Brennan, Atlanta, GA, for Defendants—Fulton County, State of Georgia and Fulton Co. Board of Commissioners.

Dennis McRay Young, Office of Atlanta City Attorney, Law Department, Atlanta, GA, for Defendant—City of Atlanta, State of Georgia.

## ORDER

STORY, District Judge.

This case comes before the Court for consideration of County Defendants' Motion for Certification of Order for Interlocutory Appeal [77–1],[1] Defendants Barrett and Freeman's Motion to Dismiss Counts in the Fourth Amended Complaint [85–1], Defendant City of Atlanta's Motion to Dismiss the Fourth Amended Complaint [87–1], County Defendants' Motion to Dismiss Plaintiffs' Fourth Amended Complaint [88–1], Plaintiffs' Consent Motion for an Extension of Time to Respond to Defendants Barrett and Freeman's Motion to Dismiss [89–1], County Defendants' Motion to Stay

---

1. The term "County Defendants," as used herein, refers to Fulton County and the seven members of the Fulton County Board of Commissioners.

Discovery [92–1], Defendants Barrett and Freeman's Motion to Stay Discovery [93–1], Plaintiffs' Motion for Extension of Time to Respond to City of Atlanta's Motion to Dismiss [95–1]; Plaintiffs' Second Consent Motion for Extension of Time to Respond to County Defendants' Motion to Dismiss [101–1], and Plaintiffs' Motion for Judicial Notice [113–1].

As a preliminary matter, Plaintiffs' Consent Motion for an Extension of Time to Respond to Defendants Barrett and Freeman's Motion to Dismiss [89–1], Plaintiffs' Consent Motion for Extension of Time to Respond to City of Atlanta's Motion to Dismiss [95–1], and Plaintiffs' Second Consent Motion for Extension of Time to Respond to County Defendants' Motion to Dismiss [101–1] are **GRANTED** *nunc pro tunc.*[2] Likewise, Plaintiffs' Motion for Judicial Notice [113–1], being unopposed, is **GRANTED.** *See* LR 7.1B, NDGa ("Failure to file a response shall indicate that there is no opposition to the motion."). In accordance with its March 25, 2005 Order, moreover, the Court continues to **RESERVE RULING** on County Defendants' Motion for Certification of Order for Interlocutory Appeal [77–1]. The Court addresses the remaining motions before it through the following Order.

## Background

Plaintiffs, certain former detainees at the Fulton County Jail (the "Jail"), initiated this putative class action on April 21, 2004. In their Complaint, as presently amended, Plaintiffs assert claims under 42 U.S.C. § 1983 respecting the conditions of their confinement at the Jail. They complain about being subject to "blanket strip searches" upon entering and/or returning to the Jail, as well as their continued detention past scheduled release dates (a condition they refer to as "over-detention").

Specifically, Plaintiffs allege that they and others similarly situated were held at the Fulton County Jail for a number of days after they had served misdemeanor sentences, posted bond, or had been ordered released by a Fulton County Court. In some instances, the periods of over-detention allegedly suffered by members of the putative class lasted almost two weeks.

In addition, Plaintiffs assert that the Jail maintained a policy of "strip searching" all inmates without an individualized determination that such searches would reveal weapons, drugs, or other contraband. According to Plaintiffs, such searches were part of the process in which arrestees were "booked" into the Jail's general population. It involved an arrested individual being placed in a room with up to thirty or forty other arrestees, asked to remove his clothing, and instructed to place the clothing in a box. As a group, the arrestees were required to shower, and then, standing in a line with others, were visually inspected front and back by deputies. Further, due to the Jail's practice of incorporating booking procedures into the release process, at least some of these searches were allegedly conducted on persons who were returning from court proceedings and who were entitled to be released from the facility.

2. Plaintiffs have additionally requested leave to exceed the page limits imposed by the local rules. Because the filings already before the Court exceed those limitations, the Court will permit Plaintiffs the requested leave, and consider their papers. As it relates to future submissions, however, Plaintiffs are strongly encouraged to focus their arguments in such a way as to bring their filings into compliance with LR 7.1D, NDGa.

Plaintiffs allege that these practices at the Fulton County Jail were pervasive and had persisted for many years. Moreover, they assert that through media coverage and published judicial decisions, the unconstitutional treatment of inmates at the Jail had grown notorious, such that the government actors who placed arrestees into the Jail's custody were aware of these alleged practices.

Plaintiffs assert that the foregoing practices violate rights guaranteed them under the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution, and predict that the persons falling within the proposed classes denominated in their pleadings will number 10,000 or more. As a result of exposure to such conditions, Plaintiffs seek monetary and injunctive relief against former Fulton County Sheriff Jacqueline Barrett, Fulton County Sheriff Myron Freeman, Fulton County, the members of the Fulton County Board of Commissioners, and the City of Atlanta.

On January 13, 2005, this Court entered an Order that, *inter alia*, denied two motions to dismiss that had been filed by the County Defendants and the City of Atlanta. In doing so, the Court recognized that in order to be held liable under § 1983, a municipal body must have had control over the policy that is alleged to have violated the plaintiff's rights. Moreover, it rejected Plaintiffs' assertion that either the City of Atlanta or the County Defendants exercised sufficient control over the over-detention and strip search practices in question to be held liable under applicable precedent. Nevertheless, the Court concluded that Plaintiffs had stated a claim against these Defendants insofar as they alleged that Fulton County and the City of Atlanta, through their respective police forces, maintained a policy of *entrusting* arrestees to the Fulton County Jail with knowledge of the unconstitutional treatment these persons would face at the facility—a theory that will be referred to herein as that of "entrustment liability."

Thereafter, the Court permitted Plaintiffs to file a Fourth Amended Complaint. Defendants, including former Sheriff Jacqueline Barrett and Sheriff Myron Freeman, have now filed a second round of motions to dismiss. In addition, they request a stay of discovery. For their part, Plaintiffs, in their opposition papers, appear to request reconsideration of the Court's Order insofar as it declined to read a so-called "Jail Local Constitutional Amendment" as making the Fulton County Sheriff an officer of Fulton County in his capacity as administrator of the Jail.

## Discussion

### I. Defendants' Motions to Dismiss

Federal Rule of Civil Procedure 12(b)(6) empowers the Court to grant a defendant's motion to dismiss when a complaint fails to state a claim upon which relief can be granted. In considering whether to grant or deny such a motion, the Court looks only to the pleadings, accepting all facts pleaded therein as true, and drawing all inferences in a light most favorable to the nonmoving party. *Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964); *Conner v. Tate,* 130 F.Supp.2d 1370, 1373 (N.D.Ga.2001). The motion may be granted only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see Linder v. Portocarrero,* 963 F.2d 332 (11th Cir.1992). Motions to dismiss are disfavored and are

rarely granted. *Gasper v. La. Stadium & Exposition Dist.*, 577 F.2d 897, 900 (5th Cir.1978); *Woodham v. Fed. Transit Admin.*, 125 F.Supp.2d 1106, 1108 (N.D.Ga. 2000).

Here, Defendants' motions to dismiss present four broad issues. First, the Sheriffs' motion requires resolution of whether the claims against them are viable under the Eleventh Amendment and the doctrine of qualified immunity. Next, both the City of Atlanta and the County Defendants request that the Court reconsider and/or clarify the entrustment liability theory it articulated in its January 13, 2005 Order. Third, the County Defendants ask the Court to dismiss Plaintiffs' revised "funding-based" theory of liability. Finally, the County Defendants insist that Plaintiffs lack Article III standing to bring claims for prospective injunctive relief.

## A. Liability of Sheriffs Barrett and Freeman

Sheriff Myron Freeman argues that the Eleventh Amendment bars suit against him in his official capacity because, in the administration of the Fulton County Jail, he is acting as an "arm of the State." Both he and former Sheriff Jacqueline Barrett, moreover, claim that they cannot be held liable in their individual capacities for the challenged Jail practices under the doctrine of qualified immunity. For the reasons set forth below, the Sheriffs' motion is granted in part and denied in part.

### 1. *Eleventh Amendment Immunity*

 It is well-settled that the Eleventh Amendment precludes a prisoner from seeking monetary damages against an officer of the state in his or her official capacity. *See Miller v. King*, 384 F.3d 1248, 1259–60 (11th Cir.2004); *see also Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1524 (11th Cir.1995) ("A state, a state agency, and a state official sued in his official capacity are not 'persons' within the meaning of § 1983, thus damages are unavailable[.]"). At the same time, § 1983 contemplates, and the Eleventh Amendment does not foreclose, an action against a state official in his official capacity where the plaintiff seeks only prospective, injunctive relief. *Miller*, 384 F.3d at 1260.

] The parties debate the impact of these principles on the instant litigation. Plaintiffs contend that Sheriff Freeman, in applying the challenged Jail policies, acts as the instrument of the County, not the State, and that the Eleventh Amendment bar is consequently inapplicable. The Count finds this attempt to avoid the preclusive effect of the Eleventh Amendment unavailing in light of *Grech v. Clayton County*, 335 F.3d 1326 (11th Cir.2003), and *Manders v. Lee*, 338 F.3d 1304 (11th Cir. 2003), as well as the Eleventh Circuit's more recent decision in *Purcell ex rel. Estate of Morgan v. Toombs County*, 400 F.3d 1313 (11th Cir.2005), where it held:

[In *Manders*,] we decided that a sheriff's "authority and duty to administer the jail in his jurisdiction flows from the State, not [the] County." [Cit.] Thus *Manders* controls our determination here; [the sheriff] functions as an arm of the State—not [the] County—when promulgating policies and procedures governing conditions of confinement at the [ ] County Jail. Accordingly, even if [the plaintiff] had established a constitutional violation, [the sheriff] would be entitled to Eleventh Amendment immunity from suit in his official capacity.

400 F.3d at 1325.

Accordingly, insofar as Defendants seek a determination that the Eleventh Amend-

ment bars suit for money damages against the Sheriff in his official capacity, their motion is granted. This conclusion does not, however, foreclose Plaintiffs from seeking prospective, injunctive relief against the Sheriff.

### 2. Qualified Immunity

A considerably more difficult question is presented, however, by the Sheriffs' attempted invocation of qualified immunity. As the Eleventh Circuit explained in *Vinyard v. Wilson,* 311 F.3d 1340 (11th Cir. 2002), "[q]ualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" 311 F.3d at 1346 (*quoting Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro,* 284 F.3d 1188, 1194 (11th Cir.2002) (internal quotation marks and citations omitted).

█] Here, the parties dispute whether the rights Defendants are alleged to have violated were "clearly established" at the time the purported violations took place.[3]

A constitutional right is clearly established "only if its contours are 'sufficiently clear that a reasonable official would understand what he is doing violates that right.'" *Vaughan v. Cox,* 316 F.3d 1210, 1212 (11th Cir.2003) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). The salient question is whether the state of the law at the time of the alleged violation gave officials "fair warning" that their acts were unconstitutional. *Hope v. Pelzer,* 536 U.S. 730, 740, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002); *Holmes v. Kucynda,* 321 F.3d 1069, 1078 (11th Cir.2003); *see also Vinyard,* 311 F.3d at 1350–53 (articulating a tripartite analytical framework for ascertaining whether right at issue was "clearly established").

In answering this question, the Eleventh Circuit has instructed district courts to look to its decisions, those of the United States Supreme Court, and those of the highest court in the relevant state. *Marsh v. Butler County,* 268 F.3d 1014, 1033 n. 10 (11th Cir.2001); *but cf. Grayden v. Rhodes,* 345 F.3d 1225, 1251 n. 4 (11th Cir.2003) (recognizing that decisions by the United States Supreme Court have suggested that looking to decisions of other Circuits is appropriate in qualified immunity analysis) (Birch, J., concurring in part and dissenting in part). Qualified immunity is a question of law for the court. *Post v. City of Fort Lauderdale,* 7 F.3d 1552, 1557 (11th Cir.1993).

---

**3.** The Court acknowledges that, ideally, the first inquiry to be undertaken in the qualified immunity analysis is whether the facts as alleged, viewed in the light most favorable to the plaintiff, establish a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Here, however, Defendants have neglected to fully brief this "threshold" question, and the Court is reluctant to rule on the precise contours of

the rights at issue in this litigation without the benefit of hearing complete argument from both sides. As a consequence, it will assume for purposes of the instant motion that Plaintiffs have sufficiently alleged a constitutional violation, and addresses only the question whether the rights purportedly violated were "clearly established" within the meaning of pertinent authority.

## a. *Strip Search Policy*

■] Plaintiffs contend that, at all times relevant to this litigation, their right to be free from a blanket strip search policy was clearly established. In support of this position, they rely principally on the Supreme Court's decision in *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), and the decision of the Eleventh Circuit in *Wilson v. Jones,* 251 F.3d 1340 (11th Cir.2001). Given the importance of precedent in determining whether a right is sufficiently "clear" to warrant the denial of qualified immunity, and in light of the dynamic nature of the law as it relates to inmate strip searches, the Court examines these and other pertinent decisions in some detail below.

In *Bell,* the Supreme Court was called upon to examine the constitutionality of certain jail policies affecting pretrial detainees, including a policy requiring such persons "to expose their body cavities for visual inspection as a part of a strip search conducted after every contact visit with a person from outside the institution." 441 U.S. at 558, 99 S.Ct. 1861. The defendants argued that such searches were justified, without probable cause, both to discover and to deter attempts to smuggle contraband into the general population. *Id.* Upholding the practice under constitutional attack, the Court explained that the Fourth Amendment requires courts to balance the need for a given search against the invasion of personal rights the search entails, considering "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.* at 559, 99 S.Ct. 1861. Addressing the case before it, it concluded:

We do not underestimate the degree to which these searches may invade the personal privacy of inmates. Nor do we doubt, as the District Court noted, that on occasion a security guard may conduct the search in an abusive fashion. [Cit.] Such an abuse cannot be condoned. The searches must be conducted in a reasonable manner. [Cit.] But we deal here with the question whether visual body-cavity inspections as contemplated by the MCC rules can *ever* be conducted on less than probable cause. Balancing the significant and legitimate security interests of the institution against the privacy interests of the inmates, we conclude that they can.

*Id.* at 560, 99 S.Ct. 1861 (emphasis in original).

More than twenty years later, in *Wilson v. Jones,* 251 F.3d 1340 (11th Cir.2001), the Eleventh Circuit applied the *Bell* analysis to a case involving a strip search of a woman arrested for driving under the influence. The plaintiff in *Wilson,* before being taken to her cell, was escorted to a restroom in the jail by a female corrections officer and "instructed ... to disrobe completely, face the wall, squat, spread her buttocks, and cough three times." 251 F.3d at 1341. In addition, while no body cavity search was performed below the *Wilson* plaintiff's waist, the corrections officer examined the woman's "ears, mouth, nose and breasts during the search." *Id.*

Relying on *Bell,* the Circuit, employing a fact-specific balancing test, determined that the Jail's policy was unconstitutional because it had been conducted in the absence of a "reasonable suspicion that [the plaintiff] was concealing weapons or any other type of contraband." *Id.* at 1343. Nevertheless, it declined to deny the defendants qualified immunity, recognizing material dissimilarities between the facts before it and those reflected in binding

precedent. *Id.* at 1344–46.[4]

Two years after *Wilson,* the Eleventh Circuit once again had the opportunity to review the constitutionality of a strip search performed on pretrial arrestees. In *Evans v. City of Zebulon,* 351 F.3d 485 (11th Cir.2003) (hereinafter, *"Evans I"*), two young men were arrested while driving through the city of Zebulon, Georgia; one for speeding and refusing to submit to a breathalyzer test, the other based on mistaken identity and the resultant belief he had violated parole. 351 F.3d at 487–88. Upon arriving at the county jail, the two men were subjected to strip searches which involved an examination and prodding of their anus and genitals with a slender black object. *Id.* at 488–89.

Addressing the constitutionality of the search, the Eleventh Circuit explained, "Arrestees who are to be detained in the general jail population can constitutionality be subjected to a strip search only if the search is supported by reasonable suspicion that such a search will reveal weapons or contraband." *Id.* at 490. Because the Court found such a reasonable suspicion lacking, it held that the plaintiffs' constitutional rights had been violated. *Id.* at 490–92. Nevertheless, it granted the officer involved in the search qualified immunity. *Id.* at 495–96.

Shortly after the *Evans I* panel issued its decision, the Circuit voted to vacate the opinion and rehear the appeal *en banc. Evans v. City of Zebulon,* 364 F.3d 1298 (11th Cir.2004). On rehearing, the Court of Appeals likewise found certain characteristics of the search unconstitutional, but

concluded that the officer was not entitled to qualified immunity with respect to the allegedly abusive manner in which the search was conducted. *See Evans v. Stephens,* 407 F.3d 1272 (11th Cir.2005) (*en banc* ) (hereinafter, *"Evans II"*). The most important aspect of the *Evans II* decision for purposes here, however, was not this result, but rather the following language in which the Circuit questioned the "standard" initially articulated by the panel in *Evans I:*

> The panel opinion in this case included these words: "Arrestees who are to be detained in the general jail population can constitutionally be subjected to a strip search only if the search is supported by reasonable suspicion that such a search will reveal weapons or contraband." [Cit.] And these words doubtlessly contributed to causing some judges to vote for en banc rehearing.
>
> *Most of us are uncertain that jailers are required to have a reasonable suspicion of weapons or contraband before strip searching—for security and safety purposes—arrestees bound for the general jail population.*

407 F.3d at 1278. The Circuit went on to observe that the Supreme Court had never imposed such a "reasonable suspicion" prerequisite on inmate strip searches, but stopped short of resolving the accuracy of the panel's earlier statement. Rather, it explained that the case before it "involve[d] a different kind of search altogether: a post-arrest investigatory strip search by the police looking for evidence (and not weapons)." *Id.* at 1279.

---

**4.** In affording the defendants qualified immunity in *Wilson,* the Eleventh Circuit engaged in a "materially similar" comparison of relevant precedent to the record before it. This rigorous precedential comparison for determining whether a defendant acted in violation of a claimant's "clearly established" rights has since been criticized by the Supreme Court. *Hope v. Pelzer,* 536 U.S. 730, 740, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002).

In a concurring opinion, Judge Carnes, joined by Judge Dubina and Judge Hull, went further and expressed his "view is that reasonable suspicion is *not necessary* for a strip search of an arrestee who is to be detained in the general jail population, if that search is conducted pursuant to a generally applicable, reasonable jail policy designed to promote safety and security by guarding against the smuggling of weapons and other contraband into a detention facility." *Id.* at 1284 (Carnes, J., concurring; emphasis supplied). These Judges recognized that "a strong argument can be made" that decisions holding to the contrary, including that authored by the panel in *Wilson v. Jones*, were "wrong," and were predicated on a misinterpretation of *Bell. Id.* at 1285.

In light of the foregoing, the Court's task here is to determine whether the "strip search" policy allegedly in place at the Fulton County Jail violated clearly established rights of detainees at the time the searches were purportedly performed (*i.e.*, in 2003 and 2004). Needless to say, the broad pronouncements in *Wilson* and *Evans I*, contrasted with the *en banc* Court's election to vacate *Evans I* and subsequent reluctance in *Evans II* to impose a "reasonable suspicion" precondition on strip searches of arrestees bound for the general population, introduces a novel and awkward wrinkle into this determination. After carefully considering the issue, however, the Court is inclined to agree with Sheriffs Barrett and Freeman that they are entitled to qualified immunity with respect to the challenged searches.

As the *en banc* Court of Appeals emphasized in *Evans II*, the Supreme Court has never expressly held that, before conducting a strip search of detainees bound for the general jail population, a jailer must possess a reasonable suspicion of the concealment of weapons or other contraband. *See Evans II*, 407 F.3d at 1279. Moreover, in *Evans II*, a majority of the Court of Appeals indicated its uncertainty regarding whether such a suspicion must precede any constitutional strip search. *Id.* at 1278. Admittedly, that opinion was issued after the challenged strip searches involved in this litigation allegedly took place. But if the majority of the Eleventh Circuit continues to perceive room to debate the contours of this constitutional right, it seems to this Court that no state official could justifiably be charged with having "fair warning" that conducting a strip search absent a reasonable suspicion of contraband violates the law. *See Hope*, 536 U.S. at 740, 122 S.Ct. 2508. Put another way, this Court cannot characterize a state official's doubt in the existence of a constitutional rule "unreasonable" if his uncertainty is shared by a majority of the Eleventh Circuit Court of Appeals. *Vaughan*, 316 F.3d at 1212 (11th Cir.2003) (a right is clearly established "only if its contours are 'sufficiently clear that a reasonable official would understand what he is doing violates that right.' ") (*quoting Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).

In making this determination, the Court is aware that certain language in *Wilson* could be read as supporting a different result. *See* 251 F.3d at 1343 ("*Because Wilson was strip searched absent reasonable suspicion*, we hold that the search of Wilson, as well as the jail's policy authorizing her search, violated the Fourth Amendment prohibition against unreasonable searches and seizures.") (emphasis supplied). Nevertheless, a thorough reading of the *Wilson* opinion underscores that the constitutionality of any challenged strip search hinges on a fact-intensive in-

quiry—one in which a court is required to "consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.* at 1342 (*quoting Bell v. Wolfish*, 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).). That being the case, any "lesson" to be taken from *Wilson* cannot be divorced from the facts of that case, including the invasiveness of the search at issue there.

Thus, this Court finds it relevant that, in *Wilson*, the plaintiff had her breasts examined, and was required to "squat, spread her buttocks, and cough...." *See* 251 F.3d at 1341. Here, by contrast, Plaintiffs' pleading describes a markedly less invasive examination. Plaintiffs were simply required to submit to a visual "front and back" inspection upon leaving a shower. It is the view of this Court that such a pronounced dissimilarity between the intrusiveness of the searches at issue here in and *Wilson* could lead a reasonable official to believe one search is constitutional, while the other is not.[5]

Insofar as Sheriffs Barrett and Freeman seek qualified immunity on Plaintiffs' "strip search" claims, their motion to dismiss is granted.[6]

b. *Over–Detention*

Sheriffs Barrett and Freeman likewise seek to invoke qualified immunity on Plaintiffs' "over-detention" claims. They argue that case law within this Circuit does not establish a concrete deadline by which an

---

**5.** Plaintiffs cite *Marriott v. County of Montgomery*, 227 F.R.D. 159 (N.D.N.Y.2005), to support a contrary view. There, the District Court for the Northern District of New York considered, and ultimately rejected, an argument that no "strip search" had been performed on inmates where they were made to disrobe in front of guards. 227 F.R.D. at 168–69. The court read Second Circuit precedent as foreclosing a definition of a "strip search" as limited to those which targeted singularly private parts of the body. *Id.* at 169 ("Defendants contend that the Second Circuit has determined that in order to be constitutionally problematic, a strip search must target the breast, genitals, and anus.... This misstates the law of this Circuit."). This Court, however, does not find that *Marriott* advances Plaintiffs' qualified immunity argument. That decision, issued after the searches at issue here took place, could not have apprised Sheriffs Barrett and Freeman of the outer limits embodied in the concept of a "strip search," and the Eleventh Circuit has squarely rejected the proposition that judicial decisions outside this Circuit can "clearly establish" principles of law for those officials who operate within its boundaries. *See Marsh*, 268 F.3d at 1033 n. 10.

**6.** To be clear, this holding applies with equal force to the Plaintiffs and putative class members who fall or would fall into the so-called Alpha Arrestee Strip Search Class and Court Return Strip Search Class. These persons, according to the Fourth Amended Complaint, had obtained the status of "releasees" at the time the challenged search was performed— whether by court order or the posting of bond. It is Plaintiffs' position that there is no reason why these individuals should have to be put back into the Jail's general population prior to their release, and thus, that subjecting them to the strip search procedure that precedes reentry into that population is uniquely offensive.

In fairness to Plaintiffs, the Court appreciates that any need to conduct the challenged searches may be significantly diminished in these instances, and acknowledges that the status of the inspected persons may prove germane to the ultimate constitutional inquiry. Plaintiffs have not, however, directed the Court to any United States Supreme Court, Eleventh Circuit, or Georgia Supreme Court authority compelling a finding of unconstitutionality on these facts, and absent such authority, this Court cannot deem the rights Plaintiffs seek to vindicate *vis-a-vis* these subclasses any more "clearly established" than those of the remaining putative class. *See Marsh*, 268 F.3d at 1033 n. 10.

arrestee who is entitled to be released (*e.g.*, because he has posted bond, served his misdemeanor sentence, or been ordered released by a court) must be permitted to leave the jail. In the absence of such an indelible, "bright line" standard, the Sheriffs argue their obligation to release inmates in a timely fashion cannot be described as "clearly established." The Court disagrees.

As the Supreme Court explained in *Hope v. Pelzer*, the fundamental question in the qualified immunity analysis is whether the state of the law provided an official with "fair warning" that his treatment of the plaintiff ran afoul of the Constitution. *See Hope*, 536 U.S. at 740, 122 S.Ct. 2508. While materially similar precedent or "broad statements of principle" can unquestionably establish a right with sufficient clarity to deny an officer qualified immunity, they are not in all instances required to provide officials with the requisite notice. *See Vinyard*, 311 F.3d at 1350–52. Rather, in some cases, "the words of a federal statute or federal constitutional provision may be so clear and the conduct so bad that case law is not needed to establish that the conduct cannot be lawful." *Id.* at 1350. To borrow language from a slightly different context, there are some instances where the conduct in question goes so far beyond the "hazy border" of constitutionally permissible behavior that an official should be denied qualified immunity even absent materially similar precedent. *See id* at 1350 n. 18.

7. The U.S. Court of Appeals for the Eleventh Circuit adopted as binding precedent the decisions of the U.S. Court of Appeals for the Fifth Circuit handed down prior to September 30, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981).

[▮] As it relates to the instant case, there can be no doubt that a detainee has a "constitutional right to be free from continued detention after it was or should have been known that [he] was entitled to release...." *See Cannon v. Macon County*, 1 F.3d 1558, 1563 (11th Cir.1993), *modified*, 15 F.3d 1022 (1994); *see also Whirl v. Kern*, 407 F.2d 781, 791 (5th Cir.1968) ("There is no privilege in a jailer to keep a prisoner in jail beyond the period of his lawful sentence.").[7] While the Constitution does not mandate instantaneous release, it does require that a detainee be released within a *reasonable* time after the basis for his lawful detainment has ended. *See Whirl*, 407 F.2d at 792 ("The sheriff, of course, must have some protection too. His duty to his prisoner is not breached until the expiration of a reasonable time for the proper ascertainment of the authority upon which his prisoner is detained."); *Lewis v. O'Grady*, 853 F.2d 1366, 1370 (7th Cir.1988) ("We recognize that the administrative tasks incident to a release of a prisoner from custody may require some time to accomplish—in this case perhaps a number of hours."); *see also County of Riverside v. McLaughlin*, 500 U.S. 44, 55, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991) (Fourth Amendment required that persons arrested without warrant be given prompt judicial determinations of probable cause; establishing forty-eight hour standard to assess reasonableness of delay in light of inevitable administrative hurdles).[8]

Plainly, within a given range, what is "reasonable" as it relates to a particular

8. As explained *supra*, note 3, the Court declines at this juncture to resolve the outer boundaries of the constitutional right to be free from over-detention without the benefit of hearing full argument from the parties in this litigation. That is, it declines to resolve whether the standard announced by the Su-

individual's release presents a fact-specific question. *See, e.g., Berry v. Baca,* 379 F.3d 764, 770–72 (9th Cir.2004) (rejecting county sheriff's argument that release delays lasting up to forty-eight hours are presumptively reasonable; held twenty-nine hour delay presented question for jury); *Lewis,* 853 F.2d at 1370 (recognizing that "[i]t is virtually impossible to establish an absolute minimum time to meet all potential circumstances which might exist" in the context of inmate release; holding eleven-hour delay presented question for the jury); *Arline v. City of Jacksonville,* 359 F.Supp.2d 1300, 1310 (M.D.Fla. 2005) (two and a half hour detention following acquittal presented jury question under Fourth Amendment). Equally as plain is that there are circumstances in which a lengthy delay is *per se* unreasonable, and necessarily runs afoul of the Fourth Amendment. *See, e.g., Douthit v. Jones,* 619 F.2d 527, 532 (5th Cir.1980) ("Detention of a prisoner thirty days beyond the expiration of his sentence in the absence of a facially valid court order or warrant constitutes a deprivation of due process.").

■ Here, Plaintiffs claim to have been over-detained for durations ranging from one to ten days, with a mean over-detention period of 3.90 days.[9] (*See* Fourth Am. Compl. ¶¶ 328, 334, 340, 345, 351, 357, 363,

369, 375, 381 & 387.) In describing an "illustrative case," moreover, Plaintiffs allege that Plaintiff Alan Powell was told by guards that if he continued to complain about his over-detention, they might "lose" his paperwork—presumably intimating that a problem arrestee could be detained for longer periods of time for reasons totally unrelated to the administrative process incident to effectuating releases. (Fourth Am. Compl. ¶ 242.) It is the view of this Court that such allegations, if proven, might preclude the Sheriff's invocation of qualified immunity on Plaintiffs' "over-detention" claims.

In what has been recognized as a "clearly analogous" line of authority, the Supreme Court has established a presumptive deadline of forty-eight hours for persons arrested without a warrant to be taken before a judge for a probable cause hearing. *See County of Riverside v. McLaughlin,* 500 U.S. 44, 55, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991); *see also Lewis,* 853 F.2d at 1370 (recognizing that circumstances presented in case involving "over-detention" of inmate and *McLaughlin* were "clearly analogous"). An arrestee who is provided a hearing within that time period can prevail on a constitutional challenge only if he demonstrates the hearing was nonetheless "delayed unreasonably." *McLaughlin,* 500 U.S. at 56,

preme Court in *McLaughlin,* or some more stringent analysis, should apply when an individual challenges his continued detention beyond the expiration of the government's right to hold him. Nevertheless, the Court does not believe the case law leaves any room to doubt the existence of an individual's constitutional right to be released from detention within a reasonable time after it is or reasonably should be known that he is entitled to such release.

9. Plaintiff Alan Powell claims to have been over-detained for three days; Plaintiff Tory

Dunlap for four days; Plaintiff Lee Antonio Smith for three days; Plaintiff David Evans for ten days; Plaintiff Stanley Clemons for two days (as of the filing of the Second Amended Complaint); Plaintiff Allen Middleton for three days; Plaintiff Anthony Westbrook for four days; Plaintiff Benjamin Blake for two days; Plaintiff Henry Witherspoon for seven days; Plaintiff Antionne Wolf for one day; and Plaintiff Kristopher Matkins for four days.

111 S.Ct. 1661. Among the delays that may be considered unreasonable are those "motivated by ill will against the arrested individual, or delay for delay's sake." *Id.* Conversely, "[w]here an arrested·individual does not receive a probable cause determination within 48 hours ..., the burden shifts to the government to demonstrate the existence of a bona fide emergency or other extraordinary circumstance." *Id.* at 57, 111 S.Ct. 1661. In cases arising after *McLaughlin,* moreover, courts have recognized that an official may be denied qualified immunity where arrestees under his supervision was not given a probable cause determinations within forty-eight hours of arrest and no emergency or extraordinary circumstances justified the delay. *See, e.g., Cherrington v. Skeeter,* 344 F.3d 631, 643–44 (6th Cir.2003) (reversing summary judgment in favor of defendants on grounds of qualified immunity where arrestee held for seventy-two hours without probable cause determination and no emergency or extraordinary circumstances justified delay); *Lingenfelter v. Bd. of County Comm'rs of Reno County,* 359 F.Supp.2d 1163, 1173 (D.Kan.2005) (denying sheriff's motion to dismiss on grounds of qualified immunity where inmate was held eight days without judicial probable cause determination).

Of course, the issue presented in *McLaughlin* is not in all respects identical to that presented here. *See Berry,* 379 F.3d at 771 (observing that, "while the two contexts share the same concerns about the need for flexibility in the face of inevitable administrative and logistical delays,"

issues of over-detention and detainment pending probable cause determination "may not share the same precise calculus"). Nevertheless, in circumstances where a detainee is unquestionably entitled to be free from further governmental restraint, it cannot be doubted that the public interest in his prompt release is even greater, and the constitutional tolerance for "administrative delay" substantially less, than in the context of arrestees awaiting probable cause determinations. *See Berry,* 379 F.3d at 771–72 (declining to adopt *McLaughlin's* presumption that forty-eight hour detention is constitutional in context of over-detentions, explaining that, in over-detention context, "the societal interest in the process that result in delay, while significant, may not be as weighty as in the probable cause context[,]" and that, "the administrative burden of accelerating the release process—in particular, running a computer check on wants and holds within less than forty-eight hours—does not seem as weighty as the burden of establishing probable cause under a tight timeline"); *Brass v. County of Los Angeles,* 328 F.3d 1192, 1202 (9th Cir.2003) ("It is unclear, however, whether the 48–hour period applied to probable cause determinations is appropriate for effectuating the release of prisoners whose basis for confinement has ended. One might conclude that when a court orders a prisoner released—or when, for example, a prisoner's sentence has been completed—the outer bounds for releasing the prisoner should be *less than* 48 hours.") (emphasis supplied).[10] It follows that an official who continues to hold a detainee without legal

---

10. Ironically, this Court's review of applicable precedent reveals that *Brass* held constitutional one of the longest "over-detention" delays in reported authority (outside the realm of "mistaken identity" cases)—a delay which lasted 39 hours after a court had ordered the

detainee's release. *See* 328 F.3d at 1202. As the Ninth Circuit has observed in subsequent decisions, however, *Brass* was unique in that the detainee there did not challenge the overall length of his delay, but rather, isolated administrative practices he found objectiona-

justification for a period of time that would fail to pass muster even under *McLaughlin* cannot be said to have lacked "fair warning" that his conduct violates the Constitution.

Here, the allegations of the Complaint describe a lethargy in the Jail's release policies that could be said to exist well beyond the "hazy border" of constitutionally acceptable delay. The Court has been unable to find any case, whether within or outside of the Eleventh Circuit, in which the detainment of a properly identified individual for *days* beyond his scheduled release date was held constitutionally permissible. And, read most favorably to Plaintiffs, the allegations of the Complaint suggest that the delays at issue here may have in some instances been the product of more than a mere lack of organization, but rather, indicative of a custom of purposeful indifference to the rights of detainees— "motivated by ill will against the arrested individual, or delay for delay's sake." *McLaughlin,* 500 U.S. at 56, 111 S.Ct. 1661. Accordingly, based on the arguments and record currently before the Court, dismissal of Plaintiffs' over-detention claims on qualified immunity grounds would be improper.

**B. Entrustment Liability**

The County Defendants and the City of Atlanta also move the Court to reconsider, or, in the alternative, to clarify its January 13, 2005 holding regarding "entrustment

ble. *See Berry,* at 768–69. Because the *Brass* court considered only the reasonableness of the challenged *procedures,* rather than whether the aggregate resultant delay evinced deliberate indifference to the detainee's rights, it stands on a different footing than this and most other "over-detention" controversies.

liability."[11] The Court addresses the requests for reconsideration and clarification separately.

1. *Reconsideration*

■ Under the Local Rules of this Court, "[m]otions for reconsideration shall not be filed as a matter of routine practice." LR 7.2(E), NDGa. Consequently, motions for reconsideration are not to be submitted as a matter of course, but only when "absolutely necessary." *Id.* Such absolute necessity arises where there is "(1) newly discovered evidence; (2) an intervening development or change in controlling law; or (3) a need to correct a clear error of law or fact." *Bryan v. Murphy,* 246 F.Supp.2d 1256, 1258–59 (N.D.Ga. 2003).

■ Conversely, motions for reconsideration may not be used as a vehicle to present the court with arguments which have already been raised and rejected, or to "repackage familiar arguments to test whether the court will change its mind." *Bryan,* 246 F.Supp.2d at 1259. Likewise, such motions "may not be used to offer new legal theories or evidence that could have been presented in conjunction with the previously filed motion or response, unless a reason is given for failing to raise the issue at an earlier stage in the litigation." *Adler v. Wallace Computer Servs., Inc.,* 202 F.R.D. 666, 675 (N.D.Ga.2001).

■ Here, Defendants' arguments in support of reconsideration do not fall with-

**11.** The City of Atlanta apparently requests reconsideration on other aspects of the Court's January 13, 2005 Order as well, having incorporated in their current motion to dismiss many arguments that were already considered, and rejected, by the Court. For all the reasons stated in subsection 1, *infra,* that request is denied.

in the limited range of objections that may appropriately be raised in such a motion. Further, the Court remains of the view that a municipal body that maintains a policy of entrusting its arrestees to a jail with knowledge of the unconstitutional treatment those persons will face upon their confinement there can be liable under § 1983. *See Young v. City of Little Rock,* 249 F.3d 730, 735 (8th Cir.2001) (holding that city that entrusted its arrestees to county with knowledge of unconstitutional practice at issue could be held liable under § 1983 for injury arising out of arrestee's exposure to the practice); *Deaton v. Montgomery County,* 989 F.2d 885, 889–90 (6th Cir.1993) (in declining to hold county liable under § 1983 for city's unconstitutional practices in treatment of arrestees, emphasized that "[t]here are no facts presented indicating that the sheriff knew or should have known that strip searches were conducted in violation of state law"); *cf. also Warren v. D.C.,* 353 F.3d 36, 39 (D.C.Cir.2004) (holding that District of Columbia could be liable § 1983 for entrusting inmate to private prison with "actual or constructive knowledge that its agents will probably violate constitutional rights"); *Baker v. D.C.,* 326 F.3d 1302, 1306–07 (D.C.Cir.2003) (holding likewise). The motions for reconsideration are denied.

### 2. *Clarification*

 The County Defendants additionally request that this Court clarify its January 13, 2005 holding as it relates to the showing necessary to prevail on a theory of entrustment liability. In particular, they ask whether the "knowledge" a municipality must have to be liable under § 1983 is limited to the facts giving rise to the constitutional violation, or whether it additionally must be chargeable with knowledge of the *unconstitutionality* of the challenged practice. They assert that if the latter is required, then the legal landscape at the time the events in question took place here did not provide them with the requisite notice (a concept they insist must be construed akin to the "clearly established" test for qualified immunity) to sustain their liability under an entrustment-based theory.

This Court is inclined to agree with the County Defendants that knowledge—either actual or constructive-of the unconstitutionality of a challenged practice employed by a recipient government actor must exist before § 1983 liability may attach. *See Bd. of County Comm'rs of Bryan County v. Brown,* 520 U.S. 397, 405, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) ("Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused [another] to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of [others]."); *cf. also id.* at 411, 117 S.Ct. 1382 ("A plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision."); *City of Canton v. Harris,* 489 U.S. 378, 396, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) ("Where a § 1983 plaintiff can establish that the facts available to city policymakers put them on actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens, the dictates of *Monell* are satisfied.") (O'Connor, J., concurring in part and dissenting in part); *Warren,* 353 F.3d at 39 ("[F]aced with actual or construction knowledge that its agents will probably violate constitutional rights, the city may not adopt a policy of inaction.").

■ At the same time, however, the Court cannot agree with the County Defendants that Plaintiffs have failed to state a claim for relief when this "legal knowledge" requirement is incorporated into the entrustment liability test. Read in the light most favorable to Plaintiffs, the Fourth Amended Complaint contains allegations that the County Defendants had *actual knowledge* that the challenged practices at the Fulton County Jail were unconstitutional. (*See, e.g.,* Fourth Am. Compl. ¶ 232.) Were these allegations proven, then the County Defendants have directed the Court to no authority that would permit them to avoid § 1983 liability.[12]

## C. Plaintiffs' Revised Funding–Based Theory of Liability

■ In their Fourth Amended Complaint, Plaintiffs renew their attempt to impose § 1983 liability on Fulton County based on the County's control over the Fulton County Sheriff's budget, this time infusing their allegations with accusations of deliberate indifference. The Court finds this theory foreclosed by Eleventh Circuit precedent.

As explained in this Court January 2005 Order, the Eleventh Circuit, after a thorough examination of the relationship between the State of Georgia, its counties, and its sheriffs, flatly rejected the argument that a county's authority over a sheriff's budget can justify imposing liability on the county as a consequence of policies adopted by the sheriff. *See Manders,* 338

F.3d at 1323–24; *see also Grech,* 335 F.3d at 1339–40. Although it recognized a different result might be appropriate where a county's *own* duty to provide medical care to inmates was at issue, the provision of such care is not implicated by Plaintiffs' claims in this case. *See Manders,* 338 F.3d at 1323 n. 43 ("We stress that this case does not involve medical care, which counties have a statutory obligation to provide to inmates in county jails.") (*citing* O.C.G.A. § 42–5–2); *compare McDowell v. Brown,* 392 F.3d 1283 (11th Cir.2004) (considering deliberate indifference challenge to Georgia county's alleged under-funding of jail that was asserted to have resulted in its health services subcontractor's failure to treat inmate's medical·condition). Consequently, the Court finds Plaintiffs' revised funding-based theory of liability unavailing. Count 16 of Plaintiffs' Fourth Amended Complaint is dismissed.

## D. Plaintiffs' Standing to Pursue Injunctive Relief

■ Finally, the County Defendants challenge Plaintiffs' standing to pursue equitable relief in this case.

It goes without saying that those who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Article III of the Constitution by alleging an actual case or controversy. [Cits.] Plaintiffs must demonstrate a "personal stake in the outcome" in order to "assure that concrete adverseness which sharpens the presentation of issues" necessary for

---

12. Of course, the Court's holding that the rights of the "strip search" plaintiffs were not established with sufficient clarity to deny the defendant actors qualified immunity presents an arduous hurdle for Plaintiffs to overcome in succeeding on a theory of entrustment liability. This Court is not presently prepared, however, to entirely conflate the standard for constructive notice in the entrustment liability context with that employed in deciding whether a right is "clearly established" for purposes of qualified immunity. Given the procedural posture of this case, moreover, that issue is not before the Court.

the proper resolution of constitutional questions. [Cit.] Abstract injury is not enough. The plaintiff must show that he "has sustained or is immediately in danger of sustaining some direct injury" as the result of the challenged official conduct and the injury or threat of injury must be both "real and immediate," not "conjectural" or "hypothetical."

*City of Los Angeles v. Lyons,* 461 U.S. 95, 101–102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983). Where injunctive relief is at issue, moreover, "to have standing ... a plaintiff must show a sufficient likelihood that he will be affected by the allegedly unlawful conduct in the future." *Wooden v. Bd. of Regents of the Univ. Sys. of Ga.,* 247 F.3d 1262, 1283 (11th Cir.2001). "Although past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury ..., past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief if unaccompanied by any continuing, present adverse effects." *Id.* at 1284 (internal punctuation omitted).

▆▆▆▆ These principles often prove problematic for former detainees seeking to enjoin conditions attendant to their arrest and confinement. *See, e.g., O'Shea v. Littleton,* 414 U.S. 488, 497, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974) (equitable standing lacking where "the prospect of future injury rests on the likelihood that respondents will again be arrested for and charged with violations of the criminal law and will again be subjected to bond proceedings, trial, or sentencing before petitioners"); *cf. also Lyons,* 461 U.S. at 109, 103 S.Ct. 1660 (explaining that it was "no more than speculation" that plaintiff would once again be arrested and subjected to allegedly unlawful chokehold); *Dudley v. Stewart,* 724 F.2d 1493, 1494 (11th Cir.1984) ("Since Dudley is no longer in the custody of county jail officials, the most that can be said for his standing is that if he is released from prison, is convicted of another crime and is incarcerated in the Daugherty County Jail, he might again be subject to disciplinary confinement without due process."). Indeed, the Supreme Court has appeared singularly unwilling, "for purposes of assessing the likelihood that state authorities will reinflict a given injury ... to assume that the party seeking relief will repeat the type of misconduct that would once again place him or her at risk of that injury." *Honig v. Doe,* 484 U.S. 305, 320, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988) (collecting cases).

While acknowledging that most of their ranks had been released at the time the complaint in this case was filed, Plaintiffs attempt to avoid this standing obstacle here by focusing on three of the eleven named Plaintiffs. First, they concentrate on the claims of Mr. Powell and Mr. Blake, explaining that both men have been arrested by Fulton County Police since the original complaint was filed in April 2004: Mr. Blake once, and Mr. Powell three times. They urge that these arrests (as well as the fact that Mr. Powell remains out on bond, and that Mr. Blake is on probation) show a substantial likelihood that these men will again be detained at the Fulton County Jail and will again face allegedly unconstitutional conditions of confinement.

Admittedly, there exists some language in Supreme Court precedent intimating that a plaintiff who, prior to filing his complaint, has multiple "run-ins" with police might be able to show a sufficient likelihood of future police encounters to be able to pursue injunctive relief against an unconstitutional law enforcement practice.

*See Lyons,* 461 U.S. at 108, 103 S.Ct. 1660 ("We cannot agree that the 'odds[ ]' ... that Lyons would not only again be stopped for a traffic violation but would also be subjected to a chokehold without any provocation whatsoever are sufficient to make out a federal case for equitable relief. *We note that five months elapsed between October 6, 1976, and the filing of the complaint, yet there was no allegation of further unfortunate encounters between Lyons and the police.*") (emphasis supplied). That said, Plaintiffs have directed the Court to no authority actually holding that a civilian claimant's potential for recidivism was so high that it took his future arrest and detainment out of the realm of the hypothetical, laying the foundation for equitable standing. *Compare 31 Foster Children v. Bush,* 329 F.3d 1255, 1266 (11th Cir.2003) (in suit by foster children challenging conditions of foster care system, held children who were in custody of system had standing, explaining, plaintiffs "are in the custody of the defendants *involuntarily* ... [and t]hey *cannot* avoid exposure to the defendants' challenged conduct"); *Church v. City of Huntsville,* 30 F.3d 1332, 1337–38 (11th Cir.1994) (explaining presumption that person will not engage in misconduct placing him at risk of injury does not preclude standing "when, for reasons *beyond the plaintiff's control,* he or she is *unable* to avoid repeating the conduct that led to the original injury at the hands of the defendant"; citing as examples mental illness and homelessness) (emphasis supplied); *Cruz v. Hauck,* 627 F.2d 710, 717 (5th Cir.1980) (prisoners' claim attacking unconstitutional jail policies was not moot for purposes of class certification, even though they were not in jail at time of class certification decision, where they could easily be transferred *from prison* back to jail). This Court declines to extend precedent to find such a foundation here. Next, Plaintiffs emphasize that Mr. Clemons was still in Fulton County Jail at the time the Second Amended Complaint—which added him as a Plaintiff—was filed. Clearly, his case places him in a much stronger position to pursue injunctive relief in this litigation. *See McLaughlin,* 500 U.S. at 51, 111 S.Ct. 1661 (holding former inmates had standing to pursue injunctive claims against county where "at the time the second amended complaint was filed, plaintiffs James, Simon, and Hyde had been arrested without warrants and were being held in custody without having received a probable cause determination"); *see also Wooden,* 247 F.3d at 1285 n. 21 (distinguishing *McLaughlin* from those cases in which unconstitutional treatment had ended by the time the pleading was filed, explaining "*McLaughlin* ... concerned a situation where the plaintiffs were exposed to a continuing unconstitutional act—a protracted delay in affording them probable cause hearings—which was *ongoing at the time of the complaint*") (emphasis supplied). Mr. Clemons, however, was arrested by the City of Atlanta, not the Fulton County Police, and his standing to pursue injunctive relief *against the County* is therefore lacking. (See Jan. 13, 2005 Order at 31 ("while Fulton County may be liable for the arrestees placed in the Jail by its police department (over which it exerted control), it may *not* be subject to § 1983 liability for arrestees placed in the Jail by" other municipal or state actors) (emphasis in original).)

In sum, Plaintiffs lack standing to pursue injunctive relief against the County Defendants. Insofar as the County Defendants seek to dismiss such requests for relief, their motion is granted.

## II. Plaintiffs' Request for Reconsideration

Plaintiffs, in their opposition to Defendants' motions to dismiss, attempt to rely

on *Abusaid v. Hillsborough County Board of County Commissioners,* 405 F.3d 1298 (11th Cir.2005), as "intervening case law" establishing that a so-called Jail Local Constitutional Amendment renders the Fulton County Sheriff an officer of Fulton County in his capacity as administrator of the Jail. (*See* Jan. 13, 2005 Order at 20–23 (discussing, and rejecting, Plaintiffs' argument).) In *Abusaid,* the Eleventh Circuit held a Florida sheriff was acting as a county official in his enforcement of a county ordinance. 405 F.3d at 1304. Plaintiffs argue that, because the Sheriff was "designated" to control the Fulton County Jail pursuant to the amendment, a similar result is compelled here. The Court finds this argument to lack merit.

The "Jail Local Constitutional Amendment," as this Court's prior Order explained, provides as follows:

> The governing authority of Fulton County is hereby authorized to maintain and operate facilities within or without the boundaries of said County for the detention, incarceration or confinement of all persons (including juveniles) subject to detention, incarceration or confinement under the laws of this State, under any County resolution or under any City ordinance. Such facilities, whether designated as a jail, public works camp, or detention center, shall be under the control of such persons or official as may be designated by the governing authority of Fulton County, and need not be used exclusively for any one class of prisoner or person.

H.R. 687–1585, 1972 Sess., at 1439 § 1 (Ga.1972), *continued in effect in* S. 503, 1986 Sess., at 4428 (Ga.1986); *see also* Fulton County, Ga., Code § 1–122 (codifying same provision as part of Fulton County Code relating to powers of the Board of Commissioners). Plaintiffs argued that this provision of the Georgia Constitution and the Fulton County Code gave the Fulton County Board power over the operation of the County Jail, bringing them within the ambit of municipal liability under § 1983.

The Court declined to accept this argument in its January 13, 2005 Order, observing that it reflected a misconstruction of the cited amendment. Specifically, it pointed out that nothing in the amendment or the Fulton County Code reflected the Board's *exercise* of any power to erect a separate detention facility, or to affirmatively "designate" any person to operate such a facility. It rejected, as a matter of law, Plaintiffs' argument that mere inaction by the Fulton County Board of Commissioners had implicitly resulted in its adoption of the Fulton County Jail as its "own," and that the Board's failure to designate someone other than the Sheriff to operate the facility tacitly resulted in its "designation" of the person holding that office to so control the institution. The Court struggles to see how *Abusaid* in any way cures this basic legal flaw in Plaintiffs' argument. Their request for reconsideration is denied.

## III. Defendants' Motions to Stay Discovery

In their motions to stay discovery, Defendants request a stay during the pendency of their motions to dismiss. Those motions now having been resolved, County Defendants' Motion to Stay Discovery [92–1] and Defendants Barrett and Freeman's Motion to Stay Discovery [93–1] are **DENIED as moot.**

## Conclusion

Plaintiffs' Consent Motion for an Extension of Time to Respond to Defendants

Barrett and Freeman's Motion to Dismiss [89–1], Plaintiffs' Consent Motion for Extension of Time to Respond to City of Atlanta's Motion to Dismiss [95–1], and Plaintiffs' Second Consent Motion for Extension of Time to Respond to County Defendants' Motion to Dismiss [101–1] are **GRANTED** *nunc pro tunc.* Likewise, Plaintiffs' Motion for Judicial Notice [113–1], being unopposed, is **GRANTED.** *See* LR 7.1B, NDGa ("Failure to file a response shall indicate that there is no opposition to the motion.").

Defendants Barrett and Freeman's Motion to Dismiss Counts in the Fourth Amended Complaint [85–1], and the County Defendants' Motion to Dismiss Plaintiffs' Fourth Amended Complaint [88–1] are **GRANTED in part and DENIED in part.** Defendant City of Atlanta's Motion to Dismiss the Fourth Amended Complaint [87–1] is **DENIED.**

County Defendants' Motion to Stay Discovery [92–1] and Defendants Barrett and Freeman's Motion to Stay Discovery [93–1] are **DENIED as moot.**

In accordance with its March 25, 2005 Order, the Court continues to **RESERVE RULING** on County Defendants' Motion for Certification of Order for Interlocutory Appeal [77–1]. The County Defendants will have 30 days from the date appearing on this Order within which to either amend their pending Motion for Certification or to inform the Court that they will not be filing an amendment. Plaintiffs will have 30 days after Defendants file their amended motion or notice within which to file a response to the motion. Defendants' reply brief will be due 15 days after Plaintiffs file their response.