[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 23, 2007
THOMAS K. KAHN
CLERK

_____

No. 05-16734

_____

D. C. Docket No. 04-01100-CV-RWS-1

C. ALAN POWELL, individually, and on behalf of
all others similarly situated,
TORY DUNLAP, individually, and on behalf of
all other similarly situated, et al.,

Plaintiffs Appellees
Cross-Appellants,

versus

SHERIFF JACQUELINE BARRETT,
Fulton County, State of Georgia,
SHERIFF MYRON FREEMAN,
Fulton County, State of Georgia, et al.,

Defendants-Appellants
Cross-Appellees.

_____

Appeals from the United States District Court
for the Northern District of Georgia

_____

**(August 23, 2007)**

Before BLACK and HULL, Circuit Judges, and RYSKAMP,[*] District Judge.

BLACK, Circuit Judge:

_____

[*]Honorable Kenneth L. Ryskamp, United States District Judge for the Southern District of
Florida, sitting by designation.

# I. BACKGROUND

A. *Factual Allegations in the Complaint Concerning the Jail's Strip Search Policy*
   1. *Strip Searches as part of Point-of Entry Booking into the Jail (AR Group)*
   2. *Strip Searches after Becoming Entitled to Release at the Jail (AL Group)*
   3. *Strip Searches upon Returning from Court Appearance (CR Group)*
B. *Section 1983 Claims based on the Jail's Strip Search Policy*
   1. *Claims against the Sheriffs*
   2. *Claims against the County and the Board*
   3. *Claims against the City*
C. *District Court's Order*

# II. DISCUSSION

A. *Eleventh Amendment Immunity from Suit in Official Capacity*
   1. *Eleventh Amendment Factors*
      a. *How state law defines the sheriff's office*
      b. *Where state law vests control*
      c. *Where the entity derives its funds*
      d. *Liability for and payment of adverse judgments*
   2. *Local Constitutional Amendments*
B. *Qualified Immunity from Suit in Individual Capacity*
   1. *Constitutional Violation*
      a. *Strip searches of AR Group Plaintiffs*
      b. *Strip searches of AL and CR Group Plaintiffs*
   2. *Clearly Established Law*
      a. *Strip Searches of AR Group Plaintiffs*
      b. *Strip Searches of AL and CR Group Plaintiffs*
C. *Municipal Liability of the County and the City under § 1983*
   1. *Liability of the City*
   2. *Liability of the County*

# III. CONCLUSION

Plaintiffs, 11 male former detainees at the Fulton County Jail (the Jail), filed a putative class action under 42 U.S.C. § 1983 against the former and current sheriffs of the Jail (the Sheriffs), Fulton County (the County), the members of the Fulton County Board of Commissioners (the Board), and the City of Atlanta (the City) (collectively, Defendants).[1]  In their Fourth Amended Complaint (the Complaint), Plaintiffs claim their constitutional rights were violated when they were subjected at the Jail to "blanket strip searches," or strip searches without an individualized finding of reasonable suspicion that each Plaintiff was concealing weapons, drugs, or other contraband.  Defendants filed motions to dismiss the Complaint for failure to state a claim, arguing, *inter alia*, the Sheriffs were entitled to both Eleventh Amendment immunity and qualified immunity and the County and City lacked the requisite control over the policies at the Jail to be liable as municipalities under § 1983.  In an order dated July 5, 2005 (the Order), the district court granted in part and denied in part Defendants' motions to dismiss.[2]  In this appeal and cross-appeal, the parties challenge the district court's Order.  After

---

[1]Plaintiffs also brought state law negligence claims against the Sheriffs.  Those claims are not before us on appeal.

[2]The district court's July 5, 2005 order relies, in part, on a previous order dated January 13, 2005, in which the district court addressed the County's and City's motions to dismiss the First Amended Complaint.  We include in this opinion the pertinent analysis from the January 13, 2005 order.

hearing oral argument, considering the parties' briefs, and reviewing the pertinent record, we affirm in part, reverse in part, and remand in part.[3]

## I. BACKGROUND

In the Complaint, Plaintiffs sue former Sheriff Jacqueline Barrett in her individual capacity, current Sheriff Myron Freeman in his official and individual capacities, the County, the Board,[4] and the City. Plaintiffs seek both monetary damages and injunctive relief against Defendants.[5] Plaintiffs challenge the blanket strip searches at the Jail on behalf of three putative classes: the Arrestee Strip Search Class (AR Group), Alpha Strip Search Class (AL Group), and Court Return Strip Search Class (CR Group).[6] Although the Complaint contains a chart showing the Plaintiffs included in each strip search group, there are some discrepancies

[3]In their Complaint, Plaintiffs also claim their constitutional rights were violated when they were detained past midnight on their scheduled release dates, or "overdetained." The district court granted in part and denied in part Defendants' motions to dismiss the overdetention claims. We address the district court's orders on the overdetention claims in a separate, unpublished opinion.

[4]Plaintiffs name the members of the Board as defendants in their Complaint. Although Plaintiffs have expressed their intent to dismiss their suit against the Board, it appears Plaintiffs have not yet done so. Nonetheless, because the parties do not treat the County and the Board separately in their briefs, we, like the district court, treat the County and the Board as one in our discussion of municipal liability.

[5]Although the Complaint is not entirely clear, it appears Plaintiffs seek injunctive relief specifically against the County, the City, and Sheriff Freeman in his official capacity.

[6]Because these classes have not yet been certified by the district court, we refer to them as "groups" throughout the opinion, and we use the names assigned to each putative class in the Complaint.

between the chart and the allegations in the Complaint. The chart that appears in the appendix to this opinion is consistent with the allegations in the Complaint, and we rely on the appended chart for purposes of our opinion. As shown in the chart, the Plaintiffs and their respective strip search groups are as follows: C. Alan Powell (AR and AL Groups),[7] David Evans (AR and CR Groups), Stanley Clemons (AR Group), Allen Middleton (AR Group), Anthony Westbrook (AR Group), Benjamin Blake (AR Group), Harry Witherspoon (AR Group), Antionne Wolf (AR and CR Groups), and Kristopher Alan Matkin (AL Group).[8] Plaintiffs identify three types of blanket strip searches[9] they contend violated their Fourth and Fourteenth Amendment rights: (1) blanket strip searches of arrestees as part of their point-of-entry booking into the Jail (AR Group); (2) blanket strip searches of detainees who

---

[7]C. Alan Powell is a Plaintiff for both the AR Group and AL Group. According to the Complaint, Powell was arrested on March 20, 2004 on charges of "disorderly conduct" and "not paying a bar tab." On March 21, 2004, someone posted bond for Powell. Before being released, Powell was strip searched. This strip search is the basis of Powell's involvement in the AL Group. At some point after Powell was released, his bond was revoked. On May 20, 2004, he was re-arrested and booked back into the Jail on the same charges following revocation of his bond. Upon booking, he was strip searched. This second strip search is the basis of Powell's involvement in the AR Group.

[8]Two of the eleven plaintiffs in this case, Tory Dunlap and Lee Antonio Smith, are not included in any of the strip search groups. Plaintiffs Dunlap and Smith only assert overdetention claims against Defendants.

[9]The Complaint states that "[b]lanket strip search means a strip search conducted without any determination of whether a basis to conduct the search exists." Thus, as used in this opinion, "blanket strip search" is a strip search without an individualized finding of reasonable suspicion that each Plaintiff was concealing weapons, drugs, or other contraband.

5

posted bond or were ordered released at the Jail before their point-of-entry booking

into the Jail was started or completed (AL Group); and (3) blanket strip searches of

detainees who return from a court appearance after having been ordered released in

state court (CR Group).[10]

We first summarize the factual allegations in the Complaint as they pertain to

each group. We then explain the claims against the various Defendants and

summarize the district court's rulings on those claims.

A. *Factual Allegations in the Complaint Concerning the Jail's Strip Search Policy*

1. *Strip Searches as part of Point-of-Entry Booking into the Jail (AR Group)*

According to the Complaint, there is a policy at the Jail whereby every male

arrestee "booked"[11] into the Jail's general population upon entering the Jail,

regardless of the crime for which he is arrested, is subjected to a strip search

---

[10]Plaintiffs challenge the constitutionality of the strip searches only under the Fourth Amendment, as made applicable to the states by the Fourteenth Amendment. *See United States v. Davis*, 313 F.3d 1300, 1302 (11th Cir. 2002). Plaintiffs do not contend in their briefs that the strip searches violated rights arising independently under the Due Process Clause of the Fourteenth Amendment. Further, under the law of this Circuit, we analyze the constitutionality of a strip search conducted without reasonable suspicion under the Fourth Amendment. *See Cuesta v. School Bd. of Miami-Dade County*, 285 F.3d 962, 969 n.6 (11th Cir. 2002). We therefore apply Fourth Amendment standards in addressing the constitutionality of the strip searches at issue here.

[11]Plaintiffs use the term "booked" to refer to the process during which a person committed to the Jail is fingerprinted, identified, and entered into the Jail's computerized inmate management system. Plaintiffs explain that blanket strip searches are also a part of the booking process.

without an individualized finding of reasonable suspicion that the arrestee is concealing weapons, drugs, or other contraband. Each male arrestee is placed in a room with a group of 30 or 40 other persons, removes all of his clothing and places it in boxes, and, along with the group, takes a shower.[12] Each arrestee then either by himself or standing in line with others is visually inspected front and back by deputies. The booking strip search process is referred to as "dressing out." The AR Group Plaintiffs allege they were subjected to blanket strip searches as part of their point-of-entry booking into the Jail.

2. *Strip Searches after Becoming Entitled to Release at the Jail (AL Group)*

According to the Complaint, the Jail's inmate management system is so inefficient that many persons committed to the Jail either post bond (or have someone post it for them) or are ordered released at First Appearance hearings at the Jail before their point-of-entry booking into the Jail has been started or completed.[13] Because these detainees were not booked immediately upon entering the Jail, they are subjected to the booking process–including the booking strip

---

[12]Because there are no factual allegations in the Complaint regarding female arrestees, we refer to Plaintiffs hereinafter as "arrestees" without reference to gender.

[13]Although Plaintiffs' allegations state that the AL Group Plaintiffs are released either at the Jail or at one of the courthouses, the two AL Group Plaintiffs never left the Jail. C. Alan Powell was released after his family posted bond for him, and Kristopher Alan Matkin was ordered released by a judicial officer at the Jail.

searches–*after* posting bond or having been ordered released at the Jail.  Plaintiffs allege that, as a result, there is a practice of subjecting detainees who are to be released to booking strip searches before they are released from the Jail.[14]  The AL Group Plaintiffs allege they were subjected to booking strip searches after having posted bond, in the case of Powell, or having been ordered released at a First Appearance hearing at the Jail, in the case of Matkin.  It is not clear why Jail officials included the strip searches as part of the late booking process for the AL Group Plaintiffs given that they were to be released.  However, we assume the AL Group Plaintiffs were strip searched because they were placed into the Jail's general population, where they were held while the staff in the Records Room checked for other detention orders, warrants, or holds and processed their release.

3.  *Strip Searches upon Returning from Court Appearance (CR Group)*

Further, Plaintiffs allege the Jail has a policy whereby detainees who have been ordered released by a judge in state court are returned to the Jail following their court appearance instead of being released from the courthouse.  Upon their return to the Jail, these detainees are subjected to blanket strip searches and booked

---

[14]While Plaintiffs allege that "many"–as opposed to "all"– detainees who have posted bond or have been ordered released by a judicial officer at the Jail are subjected to booking strip searches, we nonetheless construe the Complaint as alleging a policy or practice with respect to the AL Group strip searches.  Plaintiffs refer to it as a "practice" in other parts of the Complaint.

back into the Jail's general population while the Record Rooms staff checked for other warrants or holds and processed their release.[15] The CR Group Plaintiffs, Evans and Wolf, allege they were subjected to blanket strip searches upon returning to the Jail after their court appearances. Unlike the AL Group Plaintiffs, the CR Group Plaintiffs were immediately booked upon entering the Jail and thus were already strip searched once before.[16] The CR Group Plaintiffs allege that, while in transit to and from the Jail and while at the courthouse, they were under constant supervision and were not permitted to have contact with anyone other than the Sheriff's deputies and their attorneys. According to the Complaint, the detainees' visits with their attorneys while at the courthouse were "subject to supervision by the Fulton County Sheriff's deputies."

B. *Section 1983 Claims based on the Jail's Strip Search Policy*

Plaintiffs assert § 1983 claims against Defendants based on the Jail's policies of conducting: (1) blanket strip searches of arrestees as part of their point-of-entry booking into the Jail (AR Group); (2) blanket strip searches of detainees who

---

[15]Again, while Plaintiffs allege that "many"–as opposed to "all"–detainees who are returned to the Jail following a court appearance are subjected to strip searches, we nonetheless construe the Complaint as alleging a policy or practice with respect to the CR Group strip searches. Plaintiffs refer to it as a "policy" in other parts of the Complaint.

[16]Based on Plaintiffs' allegations that every person booked into the Jail is strip searched, we must assume that because the CR Group Plaintiffs have been "booked" into the Jail, they have already been strip searched once.

9

posted bond or were ordered released at the Jail before their point-of-entry booking into the Jail was started or completed (AL Group); and (3) blanket strip searches of detainees who return from a court appearance after having been ordered released in state court (CR Group).[17]

1. *Claims against the Sheriffs*

The AR, AL, and CR Groups assert § 1983 claims against the Sheriffs in Counts 1, 5, and 9 of the Complaint, respectively. Plaintiffs allege the Sheriffs knew of the strip search policies at the Jail and acquiesced in the strip searches. According to Plaintiffs, the Sheriffs' failure to act was the "moving force" behind the constitutional violations and, by maintaining or acquiescing in the strip search policies, the Sheriffs were deliberately indifferent to the risk of constitutional injury.

2. *Claims against the County and the Board*

---

[17]Plaintiffs challenge the constitutionality of the strip searches only under the Fourth Amendment, as made applicable to the states by the Fourteenth Amendment. *See United States v. Davis*, 313 F.3d 1300, 1302 (11th Cir. 2002). Plaintiffs do not contend in their briefs that the strip searches violated rights arising independently under the Due Process Clause of the Fourteenth Amendment. Further, under the law of this Circuit, we analyze the constitutionality of a strip search conducted without reasonable suspicion under the Fourth Amendment. *See Cuesta v. School Bd. of Miami-Dade County*, 285 F.3d 962, 969 n.6 (11th Cir. 2002). We therefore apply Fourth Amendment standards in addressing the constitutionality of the strip searches at issue here.

The AR, AL, and CR Groups assert § 1983 claims against the County and the Board in Counts 3, 7, and 11 of the Complaint, respectively. Plaintiffs allege the County and the Board had "ultimate authority" over the Jail, failed to adequately fund and staff the Jail and the County's criminal justice network, and failed to train the Sheriffs and their staff.

According to Plaintiffs, the County and the Board have authority to "maintain and operate facilities for the detention, incarceration or confinement of all persons subject to confinement under the laws of the state, any county resolution, or any city ordinance." They claim the County exercised its authority when it built the current Jail. According to Plaintiffs, the Board has the power to designate the person who controls the County's incarceration facilities, and the Board has designated the sheriff as the person who operates and controls the Jail. Plaintiffs allege, therefore, that "the Board, not the sheriff, has ultimate control" over the Jail.

Plaintiffs also allege the County, through the Board, sets the budget for the Jail; administers the Fulton County Civil Service System, which governs all county employees, including deputies, Records Room staff, and other Jail staff; maintains a unified pension system for all county employees, including the sheriff and the sheriff's staff; and supervises the sheriff's duties to hire, discipline, and fire Jail

11

employees, as well as the sheriff's duties to formulate, implement, and execute "policies concerning the operation of the Fulton County Jail facilities subject to the authority of the Board." Lastly, Plaintiffs allege the Board controls and operates the Fulton County Police Department, which transports the individuals it arrests to the Jail for confinement.

Plaintiffs allege the County and the Board "knew or should have known" of the illegal strip searches at the Jail and were "deliberately indifferent" to the rights of Plaintiffs to be free from such strip searches. Plaintiffs claim the County's and the Board's "deliberate indifference" was the "motivating factor" of Plaintiffs' injuries.

3. *Claims against the City*

The AR, AL, and CR Groups assert § 1983 claims against the City in Counts 4, 8, and 12 of the Complaint, respectively. Plaintiffs allege the City has control over the Atlanta Police Department's policy of charging persons arrested within the municipality with either municipal or state offenses and over where to incarcerate those persons, even those charged with state offenses.

Specifically, Plaintiffs state that, prior to January 1, 2003, the Atlanta Police Department committed all persons it arrested, even those it charged with state offenses, to a City of Atlanta detention facility instead of the County Jail. The City

12

detained and assumed responsibility for conducting probable cause hearings for all persons its officers arrested, whether the persons were arrested on state or municipal charges. Persons arrested for state offenses for whom probable cause was found were then transferred to the Jail. However, many of the persons arrested for state offenses had their charges reduced to municipal offenses at their probable cause hearings, and thus many arrestees were never transferred to the County Jail.

Plaintiffs allege that during 2002, the mayor developed–and the city council approved–a new policy to "save money for the City." As of January 1, 2003, the City ceased its policy of committing persons arrested within the municipality to an Atlanta detention facility and holding their First Appearance hearings there. Instead, under the new policy, the Atlanta Police Department began charging all arrestees with state offenses, whenever possible, and committing those persons directly to the Jail, instead of detaining them in the City detention facility as they had previously done.

According to Plaintiffs, the City knew or should have known the Jail had a custom and policy of subjecting the AR, AL, and CR Group Plaintiffs to illegal blanket strip searches and still chose to change its policy. Plaintiffs allege the City was "deliberately indifferent" to the rights of Plaintiffs, and its deliberate indifference was the "moving force" behind Plaintiffs' injuries.

13

C. *District Court's Order*

In its Order, the district court addressed Defendants' motions to dismiss the Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *Powell v. Barrett*, 376 F. Supp. 2d 1340 (N.D. Ga. 2005).

In response to the Sheriffs' motion to dismiss, the district court first determined Sheriff Freeman functions as an arm of the State and, therefore, is entitled to Eleventh Amendment immunity from claims against him in his official capacity seeking monetary damages. *Id.* at 1345-46. The district court relied on this Court's decisions in *Grech v. Clayton County*, 335 F.3d 1326 (11th Cir. 2003) (en banc), *Manders v. Lee*, 338 F.3d 1304 (11th Cir. 2003) (en banc), and *Purcell ex rel. Estate of Morgan v. Toombs County*, 400 F.3d 1313 (11th Cir. 2005), where we stated that a sheriff "functions as an arm of the State–not [the] County–when promulgating polices and procedures governing conditions of confinement at the [ ] County Jail." *Powell*, 376 F. Supp. 2d at 1345 (alterations in original). The district court clarified, however, that the Eleventh Amendment did not foreclose Plaintiffs from seeking prospective, injunctive relief against Sheriff Freeman in his official capacity.

The district court also determined the Sheriffs were entitled to qualified immunity from Plaintiffs' strip search claims for monetary damages against the

14

Sheriffs in their individual capacities. *Id.* at 1346-50. After assuming Plaintiffs

had sufficiently alleged constitutional violations, the district court determined that

Plaintiffs' right to be free from blanket strip searches was not clearly established.

*Id.* at 1346 n.3, 1349. The district court analyzed this Court's decisions in *Wilson*

*v. Jones*, 251 F.3d 1340 (11th Cir. 2001), and this Court's panel and en banc

decisions in *Evans v. City of Zebulon,* 351 F.3d 485 (11th Cir. 2003), *vacated by*

364 F.3d 1298 (11th Cir. 2004), and *Evans v. Stephens*, 407 F.3d 1272 (11th Cir.

2005) (en banc) (*Evans I* and *Evans II*, respectively). *Id.* at 1347-50. It found that

because this Circuit had "perceive[d] room to debate the contours of this

constitutional right," the Sheriffs could not justifiably be charged with having fair

warning that conducting strip searches absent reasonable suspicion violated the

law. *Id.* at 1349. Accordingly, the district court dismissed the strip search claims

against the Sheriffs in their individual capacities. *Id.* at 1350.

In response to the County's and City's motions to dismiss, the district court

agreed the County and the City lacked the requisite control over the strip search

policies at the Jail to be liable under § 1983 for such policies.[18] The district court

---

[18]The district court first addressed the County's and City's liability in its January 13, 2005 order. In their motions to dismiss the Complaint, the County and City requested the district court reconsider, or, alternatively, clarify its January 13, 2005 holding regarding their potential liability under § 1983. The district court denied the request for reconsideration, but granted the request for clarification.

15

explained that, with respect to the City, Plaintiffs failed to advance any allegation that the City "controlled" or was "actually responsible for" the strip search practices at the Jail. With respect to the County, the district court found the County could not be held liable for the strip search practices at the Jail under *Grech* and *Manders*, explaining that a Georgia sheriff acts as an arm of the state in his or her corrections and detainee-oversight roles and the County lacks any meaningful authority to direct the sheriff's actions in those regards. Further, the district court rejected Plaintiffs' argument that three "local constitutional amendments" applicable only to Fulton County gave the County control over the operation of the Jail and treatment of detainees at the Jail. The district court explained that it found nothing in the amendments or the Fulton County Code reflecting the Board's *exercise* of any potential authority granted by the amendments. Additionally, it found the amendments did not give the County the authority to direct the policies of the Sheriffs, nor did they alter the established allocation of power between the Sheriffs and County with respect to corrections.

The district court nonetheless concluded Plaintiffs had stated a claim against the County and the City insofar as Plaintiffs alleged the County and the City, through their respective police forces, maintained a policy of placing their respective arrestees in the Jail with knowledge of the Jail's unconstitutional

16

practices. According to the district court, in addition to the policies at the Jail, Plaintiffs had identified another "proximate 'moving force'" behind their alleged constitutional violations, namely, the County's and City's policies of placing their arrestees at the Jail. The district court found that, because Georgia law suggests the County and the City *do* control where their respective police departments place arrestees, the County and the City could face § 1983 liability for these policies. Accordingly, the district court denied the County's and City's motions to dismiss. *Id.* at 1356, 1360.

## II. DISCUSSION

On appeal, the County and the City maintain they cannot be held liable under § 1983 for their policies of placing arrestees at the Jail. They argue that because they do not control the policies at the Jail, Plaintiffs' claims against them must be dismissed.

On cross-appeal, Plaintiffs contend the district court erred in determining Sheriff Freeman is entitled to Eleventh Amendment immunity because, under three local constitutional amendments applicable to Fulton County, the County operates the Jail and thus the Sheriff acts for the County rather than the State of Georgia.[19]

---

[19]Alternatively, Plaintiffs contend that Sheriff Freeman is not entitled to Eleventh Amendment immunity because suing him in his official capacity amounts to suing the Sheriff's office, which is neither an arm of the County nor an arm of the State but is instead an

17

Plaintiffs also cross-appeal the district court's determination that the Sheriffs are entitled to qualified immunity from the strip search claims against them in their individual capacities. Plaintiffs argue their constitutional rights to be free from blanket strip searches was clearly established at the time they were strip searched at the Jail.

We must determine, therefore, whether (1) Sheriff Freeman is entitled to Eleventh Amendment immunity from Plaintiffs' strip search claims for monetary damages against him in his official capacity; (2) Sheriff Barrett is entitled to qualified immunity from Plaintiffs' strip search claims for monetary damages against her in her individual capacity;[20] and (3) the County and City are subject to municipal liability under § 1983 for Plaintiffs' strip search claims.

We note at the outset that we have jurisdiction to consider the issues raised on both appeal and cross-appeal pursuant to 28 U.S.C. § 1292(b). Section

independent entity. Plaintiffs did not raise this argument before the district court, however, arguing only that Sheriff Freeman acts for Fulton County and not as an arm of the State. We therefore decline to consider whether the sheriff's office is independent from both the County and the State. *Madu v. U.S. Att'y Gen.*, 470 F.3d 1362, 1366 n.2 (11th Cir. 2006) ("[A]n argument made for the first time in the court of appeals is generally waived."); *see also Manders*, 338 F.3d at 1328 n.54.

[20]Defendants claim Plaintiffs lack standing to sue Sheriff Freeman in his individual capacity because the allegations in the Complaint show that all Plaintiffs were released from the Jail before Sheriff Freeman took office. We agree and remand to the district court to dismiss Plaintiffs' strip search claims for monetary damages against Sheriff Freeman in his individual capacity. Thus, we address qualified immunity only with respect to the strip search claims for monetary damages against Sheriff Barrett in her individual capacity.

18

§ 1292(b) permits this Court to review a district court order not otherwise appealable as an interlocutory decision if the district court certifies that its order "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). The district court certified the issues addressed in its Order for immediate appeal in an order dated August 1, 2005. Defendants timely petitioned and Plaintiffs timely cross-petitioned this Court for permission to appeal the Order, and we granted the petitions on December 8, 2005.[21]

We review the district court's rulings on a motion to dismiss for failure to state a claim *de novo*, accepting all factual allegations as true and construing them in the light most favorable to the plaintiff. *Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003); *see also Ass'n for Disabled Americans, Inc. v. Fla. Int'l Univ.*, 405 F.3d 954, 956 (11th Cir. 2005) (applying *de novo* standard to district court's grant of a motion to dismiss based upon Eleventh Amendment immunity); *Dalrymple v. Reno,* 334 F.3d 991, 994 (11th Cir. 2003) (applying *de novo* standard to district court's decision to grant or deny the defense of qualified immunity on a

---

[21]The district court's certification and this Court's grant of permission to appeal also included the issues addressed in the district court's January 13, 2005 order.

19

motion to dismiss).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, __ U.S. __, 127 S. Ct. 1955, 1964-65 (2007) (citations and internal quotations omitted).  A complaint is subject to dismissal under Rule 12(b)(6) when the allegations in the complaint, on their face, show that an affirmative defense bars recovery on the claim.  *Marsh v. Butler County*, 268 F.3d 1014, 1022 (11th Cir. 2003) (en banc).

A.  *Eleventh Amendment Immunity from Suit in Official Capacity*

We first address whether Sheriff Freeman is entitled to Eleventh Amendment immunity from Plaintiffs' strip search claims for monetary damages against him in his official capacity.  "The Eleventh Amendment protects a State from being sued in federal court without the State's consent." *Manders*, 338 F.3d at 1308.  The Eleventh Amendment also bars suits brought in federal court against a defendant acting as an "arm of the State." *Id.*  To determine whether a defendant is an "arm of the State," this Court examines the four factors enumerated in *Manders*: "(1) how state law defines the entity; (2) what degree of control the State maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for

20

judgments against the entity." *Id.* at 1309. The factors must be considered "in light of the particular function in which the defendant was engaged when taking the actions out of which liability is asserted to arise." *Id.* at 1308. Further, our determination is dependent on the law of the state in which the sheriff operates, since "states have extremely wide latitude in determining their forms of government and how state functions are performed." *Id.* at 1309 n.10. Accordingly, at issue in the instant case is whether, under Georgia law, Sheriff Freeman acted as an arm of the State in promulgating policies and procedures to maintain security at the Jail for the safety of detainees, visitors, and jail personnel, through the Jail's strip search policy.

In *Manders*, this Court addressed whether the sheriff of Clinch County, Georgia, was an arm of the State with respect to his "force policy at the jail and the training and disciplining of his deputies in that regard." *Id.* at 1308-09. Recognizing that resolution of the issue depended in part on state law, we discussed the relationship among the sheriff, the State, and Clinch County under Georgia law. *Id.* at 1309-18. Because the instant case also involves the relationship of a Georgia sheriff with the county in which he operates and the State, we rely on the pertinent discussion of Georgia law in *Manders*.

In *Manders*, we noted:

> Georgia's Constitution grants the State legislature the exclusive authority to establish and to control a sheriff's powers and duties. Interpreting this constitutional provision, the Georgia Supreme Court has explained that sheriffs are subject to the control of the Georgia legislature and are *not* county employees. . . .
>
> In contrast to the State's authority and control over sheriffs, Georgia's Constitution grants counties no legislative power or authority over sheriffs and expressly prevents counties from controlling or affecting the sheriff's office or the personnel thereof. In this regard, the Georgia Supreme Court has concluded that this constitutional restriction on the legislative power granted to counties–home rule–prevents counties from taking action affecting the sheriff's office. . . .
>
> Further, in Georgia, counties also do not delegate any of their governmental or police powers to sheriffs. Instead, the sheriffs' authority and duties are derived directly from the State. . . .
>
> Georgia law likewise makes the county entity itself, here Clinch County, a separate entity independent of the sheriff's office. . . . As a separate entity, Clinch County is headed by its Board of Commissioners, which is given "exclusive jurisdiction over and control of county affairs." In contrast, under Georgia's Constitution, the State has exclusive authority and control over the duties and affairs of the sheriff's office. Although the State requires the county to fund the sheriff's budget, Georgia's Constitution precludes the county from exercising any authority over the sheriff, including how the sheriff spends that budget.

*Id.* at 1310-11 (emphasis in original) (citations omitted); *see also Bd. of Comm'rs of Dougherty County v. Saba,* 598 S.E.2d 437, 439 (Ga. 2004) ("The sheriff is an elected constitutional officer and not an employee of the county commission."); *Bd.*

22

*Of Comm'rs of Randolph County v. Wilson*, 396 S.E.2d 903, 903 (Ga. 1990) (same).

With this brief summary of the relationship between the State, the sheriff, and the County, we turn to the four factors in *Manders*. Although *Manders* analyzed the four factors in light of a sheriff's use-of-force policy, *see Manders, 338 F.3d at 1305*, we determine that the analysis in *Manders* is applicable to Sheriff Freeman's function of maintaining security at the Jail. And, guided by *Manders*, we conclude the factors weigh in favor of finding that Sheriff Freeman is an arm of the State in performing this function. *See Purcell,* 400 F.3d at 1325-26 (11th Cir. 2005) (finding, in a suit against the sheriff of Toombs County, Georgia for failure to prevent inmate-on-inmate violence, the sheriff acts as an arm of the State "when promulgating policies and procedures governing conditions of confinement at the Toombs County Jail").[22] We briefly analyze the four factors below.

---

[22]*Compare Brown v. Dorsey*, 625 S.E.2d 16, 21 (Ga. Ct. App. 2005) (finding that, for purposes of municipal liability under § 1983, the sheriff of Dekalb County, Georgia, did not act as final policymaker for the county when using departmental personnel and resources to commit a murder and thus the county could not be liable for the sheriff's actions under § 1983), *with Freeman v. Barnes*, 640 S.E.2d 611, 615-16 (Ga. Ct. App. 2006) (finding that the sheriff is a county official for workers' compensation purposes).

1. *Eleventh Amendment Factors*

    a. *How state law defines the sheriff's office*

The sheriff's office is a "separate and independent office" from the county and its governing body, notwithstanding that the sheriff is elected by county voters. *Manders*, 338 F.3d at 1319; *Brown v. Dorsey*, 625 S.E.2d 16, 21 (Ga. Ct. App. 2005) ("[T]he Constitution has made the sheriff independent from the County, notwithstanding the designation of the sheriff as a 'county officer.'"). The essential governmental nature of the sheriff's office is to (1) enforce the law and preserve the peace on behalf of the State and (2) perform specific statutory duties, *directly assigned by the State*, in law enforcement, state courts, and corrections. *Manders*, 338 F.3d at 1319. With respect to corrections, in particular, the State requires the sheriff to take custody of pre-trial detainees charged with state felony and misdemeanor offenses.[23] *Id.* at 1315. The State also charges the sheriff with providing for the protection and well-being of the detainees in his custodial care.

---

[23]Under O.C.G.A. 42-4-12, the sheriff has a duty to accept persons charged with an indictable offense, and by implication, a right to refuse to receive any municipal prisoner who is not charged with an offense against the State. *Tate v. Nat'l Sur. Corp.*, 200 S.E. 314, 315 (Ga. Ct. App. 1938). In the instant case, although some of the Plaintiffs were arrested by the Atlanta Police Department, we assume based on Plaintiffs' allegations that they were all charged with state offenses.

*Mayo v. Fulton County*, 470 S.E.2d 258, 259 (Ga. Ct. App. 1996).[24] Thus, in performing his State-assigned function of maintaining security at the Jail, Sheriff Freeman acted for the State. Based on *Manders*, therefore, we conclude the first factor weighs in favor of immunity.

      b. *Where state law vests control*

The State requires, and funds, annual specialized training of sheriffs in law enforcement, investigation, judicial process, and corrections practices. *Manders,* 338 F.3d at 1320. It is reasonable to assume that the State-mandated training in corrections includes instruction on maintaining security at the Jail and protecting the safety of detainees and others at the Jail. If a sheriff fails to comply with the annual training requirements, the Governor–on behalf of the State–may sanction the sheriff for noncompliance. *Id.* at 1320. In fact, as we recognized in *Manders*, the Governor retains significant control over sheriffs:

> [T]he Governor has broad investigation and suspension powers regarding any misconduct by a sheriff in the performance of any of his duties. If a sheriff's policy permits excessive force in the county jail, plainly the Governor may discipline the sheriff. If a sheriff fails to take custody of state offenders in the county jail, plainly the Governor may discipline the sheriff. The State legislature expressly has made [the Sheriffs] answerable to the Governor for [their] conduct . . . .

---

[24]We note, as we did in *Manders*, that this is not a case of feeding, clothing, or providing medical care to inmates, which are matters over which Fulton County does have obligations and which are therefore county functions. *Manders*, 338 F.3d at 1319, 1322.

> Specifically, the Governor may initiate an investigation of any suspected misconduct by any sheriff and may suspend the sheriff. . . . The State funds the investigation.

*Id.* at 1321 (citations omitted).

In contrast to the State's and Governor's authority over the sheriff's office, the counties have no authority or control over the sheriff's corrections duties. *See id.* at 1322. While Georgia counties have obligations regarding the jail structure and inmates' food, clothing, and medical necessities, those matters are "wholly separate and distinct" from the sheriff's policies governing strip searches and release of detainees at the Jail. *See id.* Given "the State's direct and substantial control over the sheriff's duties, training, and discipline and the county's total lack thereof," *id.*, we determine that the second factor also weighs in favor of immunity in this case.

### c. *Where the entity derives its funds*

State funds are involved, to some extent, in the functions at issue here, including the annual training of sheriffs in corrections matters and in the Governor's disciplinary procedure over sheriffs for misconduct. *See id.* at 1323. While counties bear the major burden of funding the sheriff's office and county jail, they are required to do so by State law. *Id.* The State requires the County to

pay for pre-trial state offenders, maintain the jail structure, provide necessities to inmates, and pay the salaries of the Sheriffs and their deputies. *Id.* at 1323 & n.42. Although the County sets and funds the sheriff's total budget, however, it cannot dictate how the sheriff spends that budget in the exercise of the Sheriffs' duties, including their duties to maintain security at the Jail. *See id.* at 1323; *see also McMillan v. Monroe County,* 520 U.S. 781, 791, 117 S. Ct. 1734, 1740 (1997) ("The county's payment of the sheriff's salary does not translate into control over [the sheriff], since the county neither has the authority to change [the sheriff's] salary nor the discretion to refuse payment completely."); *Chaffin v. Calhoun*, 415 S.E.2d 906, 907-08 (Ga. 1992). Because both state and county funds are involved in the function at issue here, and because county funds are involved only by virtue of state law, we conclude the third factor weighs in favor of immunity. *See Manders*, 338 F.3d at 1324.

### d. *Liability for and payment of adverse judgments*

Under Georgia law, "counties are not liable for, and not required to give sheriffs money to pay, judgments against sheriffs in civil rights actions." *Id.* at 1326. We noted in *Manders*, however, that while the counties would not be liable for judgments against the sheriffs, the State might not be liable either. *Id.* at 1327. We could not find a Georgia law that expressly required the State to pay an adverse

27

judgment against the Sheriff in his official capacity. *Id.* We suggested, therefore, that the sheriff may have to pay a judgment against him out of his own budget. *Id.* This could, in turn, affect both state and county funds indirectly. *Id.* The situation in *Manders* with respect to the county's or state's liability for adverse judgments is the same as that in the instant case. Thus, we conclude, as did the *Manders* court, that the fourth factor, "at a minimum, . . . does not defeat Sheriff [Freeman's] immunity claim." *Id.* at 1328.

2. *Local Constitutional Amendments*

Plaintiffs maintain on appeal that three local constitutional amendments applicable only to Fulton County alter the "default" allocation of authority between a Georgia sheriff and the county established in *Manders*. In particular, Plaintiffs rely on the amendment they refer to as the "Jail Local Constitutional Amendment" (JLCA).[25] Plaintiffs contend that because the JLCA authorizes the County to

_____

[25]The full text of the JLCA is as follows:

The governing authority of Fulton County is hereby authorized to maintain and operate facilities within or without the boundaries of said County for the detention, incarceration or confinement of all persons (including juveniles) subject to detention, incarceration or confinement under the laws of this State, under any County resolution or under any City ordinance. Such facilities, whether designated as a jail, public works camp or detention center, shall be under the control of such person or official as may be designated by the governing authority of Fulton County, and need not be used exclusively for any one class of prisoner or person.

H.R. 687-1585, 1972 Sess., at 1439 § 1 (Ga. 1972), *continued in effect* in S. 503, 1986 Sess., at 4428 (Ga. 1986); *see also* Fulton County, Ga., Code § 1-122.

Plaintiffs also rely on two other constitutional amendments, which they refer to as the "Civil Service Local Constitutional Amendment" and the "Pension Local Constitutional

28

"maintain and operate" detention facilities and designate a person to "control" those facilities, the Sheriff acts for the County rather than as an arm of the State in operating the County's Jail.

We disagree. The three local amendments to which Plaintiffs draw our attention do not affect our reliance on *Manders*. We recognize that, in *Manders*, we stated in a footnote that a local act of the State legislature could give a Georgia county control over the county jail, such as a local act granting Chatham County control over its jail.[26] *Manders*, 338 F.3d at 1318 n.34. The Chatham County act explicitly gives the commissioners of Chatham County the power to make "rules and regulations" for the "government and control" of the Chatham County jail and inmates. Further, the Chatham County act affirmatively vests the commissioners with the "management and care" of the jail. By contrast, the JLCA does not give the County power to make rules and regulations for the administration of the Jail. Therefore, the JLCA does not alter the relationship among the State, the County,

---

Amendment." We agree with the district court that these amendments do not establish the requisite control on the part of the County to render the Sheriff a county actor.

[26]The text of the local act giving Chatham County control over its jail is as follows: "Said Commissioners (of Chatham County) shall have power to make proper rules and regulations for the government and control of *said jail of Chatham County*, and the prisoners and inmates therein, and, except as hereinbefore provided, are hereby invested with the management and care of said jail." *Griffin v. Chatham County*, 261 S.E.2d 570, 572 (Ga. 1979) (emphasis added).

and the Sheriff, as the County continues to have no say in how the Sheriff implements his policies at the Jail. However, even if the JLCA altered the analysis in *Manders*, the County has not exercised any potential authority granted to it under the JLCA because the Sheriff, an office established by the State legislature, continues to control the Jail.

Under Georgia law, the office of sheriff carries with it all of its common-law duties and powers, except as modified by statute. *Elder v. Camp*, 18 S.E.2d 622, 625 (Ga. 1942). Where a statute limits the common-law duties and powers of a sheriff, it must be strictly construed, particularly where the limitation or restriction applies to only one sheriff in the State. *Warren v. Walton*, 202 S.E.2d 405, 409 (Ga. 1973). We cannot conclude the JLCA definitely and positively grants to the County the traditional powers allocated to the sheriff of a Georgia county, thereby altering the established allocation of power between the State, the County, and Sheriff Freeman. We therefore affirm the district court's determination that Sheriff Freeman is entitled to Eleventh Amendment immunity, and we dismiss Plaintiffs' claims against Sheriff Freeman in his official capacity to the extent Plaintiffs seek monetary damages.[27]

---

[27]The Eleventh Amendment does not prevent Plaintiffs from seeking prospective, injunctive relief against Sheriff Freeman in his official capacity. *See Frew ex rel. Frew v. Hawkins,* 540 U.S. 431, 437, 124 S. Ct. 899, 903 (2004). Defendants maintain, however, that

B. *Qualified Immunity from Suit in Individual Capacity*

We turn next to whether Sheriff Barrett is entitled to qualified immunity

from Plaintiffs' strip search claims for monetary damages against her in her

individual capacity. "Qualified immunity offers complete protection for

government officials sued in their individual capacities if their conduct 'does not

---

Plaintiffs lack standing to pursue prospective injunctive relief on their strip search claims against both Sheriff Freeman in his official capacity and against the City. We need only address Plaintiffs' standing to seek injunctive relief against Sheriff Freeman in his official capacity because we dismiss the strip search claims against the County and the City in section II.C. below. In order to meet the constitutional minimum for standing to seek injunctive relief, Plaintiffs must show they "[have] sustained or [are] immediately in danger of sustaining some direct injury as the result of the challenged official conduct and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-102, 103 S. Ct. 1660, 1665 (1983) (internal quotations omitted). "[P]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *Id.* (internal quotations omitted). All Plaintiffs (other than Stanley Clemons) had been released from the Jail before they were added as parties to this suit. We agree with the district court that the threat they face of future unconstitutional strip searches is too speculative or conjectural and not real and immediate. *See, e.g., Shain v. Ellison*, 356 F.3d 211, 216 (2d Cir. 2004) (finding the likelihood of plaintiff being subjected to unconstitutional strip search policy at correctional center after release is "too speculative and conjectural"). Further, although Clemons was still at the Jail at the time he was added as a plaintiff to this suit, he has since been released from the Jail, which moots his claim for relief. *See Spears v. Thigpen*, 846 F.2d 1327, 1328 (11th Cir. 1988) (holding that claims regarding treatment at a facility at which prisoner was no longer incarcerated were moot); *see also Wahl v. McIver*, 773 F.2d 1169, 1173 (11th Cir.1985) (explaining that absent class certification, an inmate's claim for injunctive relief under §1983 action is moot once the inmate has been transferred). Clemons does not meet the two conditions for the "capable of repetition, yet evading review" exception to apply: (1) the challenged action must be of too short a duration to be fully litigated prior to its cessation, and (2) a reasonable expectation must exist that the same complaining party will be subject to the same action again. *Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S. Ct. 347, 348 (1975). While the first condition may be satisfied, the second is not because Clemons has not demonstrated a reasonable expectation that he will again be arrested, committed to the Jail, and unconstitutionally strip searched. Thus, we conclude Plaintiffs' claims for injunctive relief against Sheriff Freeman in his official capacity should be dismissed.

violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982)). To receive qualified immunity, the government official first must prove he was acting within his discretionary authority when the alleged wrongful acts occurred. *Id.* Once the government official establishes he was acting within his discretionary authority, the burden shifts to the plaintiff to show the defendant is not entitled to qualified immunity. *Id.* The Supreme Court has established a two-part test to determine whether a defendant is entitled to qualified immunity. "The threshold inquiry a court must undertake . . . is whether [the] plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer*, 536 U.S. 730, 736, 122 S. Ct. 2508, 2513 (2002) (citing *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001)). If, under the plaintiff's version of the facts, the defendant violated a constitutional right, "the next, sequential step is to ask whether the right was clearly established." *Saucier*, 533 U.S. at 201, 121 S. Ct. at 2156.

Sheriff Barrett is undisputedly a government official. Further, Plaintiffs do not dispute that Sheriff Barrett was acting within the scope of her discretionary authority in having Plaintiffs strip searched to maintain security at the Jail. Therefore, we consider only whether, with respect to the AR, AL, and CR Group

32

Plaintiffs, Plaintiffs sufficiently alleged violations of constitutional rights and, if so, whether such rights were clearly established at the time of the alleged violations.

1. *Constitutional Violation*

a. *Strip searches of AR Group Plaintiffs*

We first address the constitutionality of the blanket strip searches conducted on the AR Group Plaintiffs as part of their point-of-entry booking into the Jail.[28] Plaintiffs allege each arrestee booked into the Jail's general population, regardless of the crime for which the person is arrested, is subjected to a blanket strip search without an individualized finding of reasonable suspicion that the person is concealing drugs, weapons, or other contraband. Under the law of this Circuit, an arrestee to be detained in the general jail population has a constitutional right under the Fourth Amendment to be free from strip searches conducted without reasonable suspicion that the detainee is concealing weapons, drugs, or other contraband. *Wilson*, 251 F.3d at 1341, 1343 (plaintiff arrested for driving under the influence); *Skurstenis v. Jones*, 236 F.3d 678, 680, 682 (11th Cir. 2000) (plaintiff arrested for driving under the influence). Thus, under our binding precedent, the Jail's alleged

---

[28]We note that, in the instant case, Plaintiffs do not challenge the *manner* of the strip searches.

33

policy of conducting blanket strip searches on all arrestees at booking, on the single ground they are to be placed in the Jail's general population, must be deemed unconstitutional. *See Wilson,* 251 F.3d at 1343; *Skurstenis*, 236 F.3d at 682.

Our holding with respect to the Jail's policy does not mean, however, that the particular strip search conducted on each AR Group Plaintiff actually violated that Plaintiff's Fourth Amendment rights. *Hicks v. Moore*, 422 F.3d 1246, 1251 (11th Cir. 2005); *Skurstenis*, 236 F.3d at 682. Reasonable suspicion may have existed to justify the searches of some Plaintiffs. *Id*. "'Whether an officer has reasonable suspicion is an objective question viewed from the standpoint of a reasonable [ ] officer at the scene. It is based on the totality of the circumstances, and is a question of law to be reviewed de novo.'" *Id.* at 1252 (quoting *Evans II*, 407 F.3d at 1280). In determining whether reasonable suspicion existed for the strip search, it is immaterial whether the specific arresting officer or jailer *actually and subjectively* had reasonable suspicion, or whether anyone at the time *actually* conducted a reasonable suspicion analysis. *Hicks*, 422 F.3d at 1252. Instead, our inquiry is whether, given the circumstances, reasonable suspicion *objectively* existed to justify the search. *Id.*

34

Our precedent demonstrates that reasonable suspicion to justify the strip search of an arrestee may be based on, among other things, the circumstances of the person's arrest and/or the nature of the offense for which the person was arrested. First, we have recognized that the circumstances surrounding a person's arrest may support reasonable suspicion to justify a strip search upon booking into the jail. 236 F.3d at 682. For example, in *Skurstenis*, we held that "possession of a weapon by a detainee [at the time of arrest] provides the 'reasonable suspicion' necessary to authorize a strip search." *Id*. Although we noted the jail's policy of conducting blanket strip searches on arrestees before being placed in a cell or detention room was unconstitutional, we upheld the particular strip search conducted on the plaintiff because, at time of her arrest for driving under the influence, she had a handgun in her possession. *Id*.[29]

Second, we have recognized that "a person's being charged with a crime of violence is sufficient to evoke reasonable suspicion that the person may be concealing weapons or contraband." *Hicks*, 422 F.3d at 1252; *see also Masters v. Crouch*, 872 F.2d 1248, 1255 (6th Cir. 1989). Similarly, where a person is arrested

---

[29]At the time of her arrest for driving under the influence, "Skurstenis had a .38 special handgun, for which she had an expired permit, in the floorboard of her car." *Skurstenis*, 236 F.3d at 680. Skurstenis was arrested only for driving under the influence, however, and was not charged with any weapons offense. *See id*.

35

for an offense involving weapons or drugs–such as possession or use of a firearm and possession, use, or distribution of an illegal substance–it is objectively reasonable to conduct a strip search of that person before he comes into contact with other detainees. In such cases, the nature of the arrest charge itself, independent of the facts surrounding the arrest, gives rise to reasonable suspicion. On the other hand, where a person is arrested for an offense not generally associated with violence and not involving weapons or drugs, the single fact the arrestee will be placed in the general jail population is not sufficient justification for the search under our binding precedent. *See Hicks*, 422 F.3d at 1251-52. In such a case, there must be additional facts giving rise to reasonable suspicion that the person is concealing weapons, drugs, or other contraband, such as the circumstances surrounding the person's arrest, as in *Skurstenis*.

We have declined to draw a distinction between felonies and misdemeanors, recognizing there exist both felonies and misdemeanors that are crimes of violence or that involve weapons or drugs and whose nature, therefore, give rise to reasonable suspicion that the arrestee is concealing weapons, drugs, or other contraband. In *Hicks*, for example, a panel of this Court found that the misdemeanor offense of "family violence battery," for which the detainee was arrested and charged, justified the strip search conducted on the plaintiff. 422 F.3d

36

at 1252. Because it was the first time the plaintiff had been arrested for and charged with family violence battery, he was charged with a misdemeanor. *See id.* at 1249 n.2. Finding the offense was "obviously one of violence," the panel explained that Georgia law defined family violence battery as "'intentionally caus[ing] substantial physical harm or visible bodily harm' to a 'past or present spouse.'" *Id.* at 1252 (quoting O.C.G.A. § 16-5-23.1(a)). The panel reached its conclusion not by considering whether the arrest charge was a felony or misdemeanor, but by looking to the elements of the offense. *See id.* The panel determined that, although the arresting officers and jailers did not subjectively suspect the detainee of concealing weapons or drugs, the nature of the arrest charge (of which the jailers were notified) was sufficient to justify the strip search. *Id.* at 1249, 1252.

We stress that under *Hicks*, the question of whether an offense is a crime of violence depends not on the offense's classification as a felony or misdemeanor, but instead on the elements of the offense for which the arrestee was arrested and charged. Where the elements of the offense demonstrate that it is a crime of violence or a crime that involves weapons or drugs, the offense itself gives rise to reasonable suspicion to justify a strip search. Of course, even where the offense is not a crime of violence and does not involve weapons or drugs, the circumstances

37

surrounding the arrest may nonetheless support reasonable suspicion that the arrestee is concealing weapons, drugs, or other contraband. *See Skurstenis*, 236 F.3d at 682.

In the instant case, there are no allegations about the circumstances surrounding the arrest of each AR Group Plaintiff. Accordingly, we can look only to the nature of the particular offenses for which the AR Group Plaintiffs were arrested to determine if their strip searches were supported by reasonable suspicion.

Based on the allegations in the Complaint, we conclude the following AR Group Plaintiffs were arrested for crimes of violence or crimes involving weapons or drugs: David Evans, arrested on a charge of disorderly conduct but transferred to the Jail on a warrant for possession of a weapon; Anthony Westbrook, arrested on a charge of simple battery;[30] and Benjamin Blake, arrested for battery.[31] Because the strip searches of these AR Group Plaintiffs were supported by reasonable suspicion based on the nature of the arrest offenses, the allegations do not establish a violation of their Fourth Amendment rights. We therefore affirm the

---

[30]According to the Complaint, Anthony Westbrook also was arrested for "child abandonment (non-support)" and on a probation warrant for "forgery."

[31]According to the Complaint, Benjamin Blake also was arrested for "trespass" and "obstruction."

38

dismissal of the strip search claims asserted by Plaintiffs Evans, Westbrook, and Blake.

We also conclude the following AR Group Plaintiffs were arrested for offenses that are not crimes of violence and do not involve weapons or drugs: C. Alan Powell, arrested after revocation of bond for "disorderly conduct" and failure to pay a "bar tab"; Stanley Clemons, arrested on a charge of burglary;[32] Allen Middleton, arrested on a warrant for an "unpaid $27 traffic ticket"; Harry Witherspoon, arrested for "driving under the influence"; and Antionne Wolf, arrested for "contempt/nonpayment of child support." The strip searches of this latter group of AR Group Plaintiffs, as alleged in the Complaint, were not supported by reasonable suspicion based on the nature of the arrest offenses alone. Therefore, the allegations in the Complaint, at least at this Rule 12(b)(6) stage, establish a violation of the Fourth Amendment rights of Plaintiffs Powell, Clemons, Middleton, Witherspoon, and Wolf.[33] We must proceed to consider whether the rights of these AR Group Plaintiffs were clearly established.

---

[32]We note that, in some circumstances, burglary may be a crime of violence. However, the allegations in the instant case are insufficient for us to make that determination.

[33]At the summary judgment stage, Defendants may show facts regarding the circumstances of each Plaintiff's arrest, the nature of the arrest offenses, or some other conduct that support reasonable suspicion. At this 12(b)(6) stage, however, we look only to the allegations in the Complaint.

Before doing so, however, we point out that a majority of our Court has expressed uncertainty about our precedent holding that strip searches of arrestees to be placed in the jail's general population, absent reasonable suspicion, violate the Fourth Amendment. *See Evans II*, 407 F.3d at 1278. In imposing a requirement of reasonable suspicion, our prior decisions relied on, but misconstrued, the Supreme Court's decision in *Bell v. Wolfish*, 441 U.S. 520, 99 S. Ct. 1861 (1979). *See Wilson*, 251 F.3d at 1342-43; *Skurstenis*, 236 F.3d at 681-82; *Justice v. City of Peachtree City*, 961 F.2d 188, 193 (11th Cir. 1992). We have since recognized our misinterpretation of *Bell*, stating: "Most of us are uncertain that jailers are required to have a reasonable suspicion of weapons or contraband before strip searching–for security and safety purposes–arrestees bound for the general jail population. Never has the Supreme Court imposed such a requirement." *Evans II*, 407 F.3d at 1279 (citations omitted). Nonetheless, we recognize we are bound by our Circuit's prior panel decisions that a jail's general practice of conducting blanket strip searches on arrestees on the single ground that they will be placed in the jail's general population is unconstitutional under *Wilson* and *Skurstenis*.

For the reasons stated above, we affirm the district court's dismissal of the strip search claims asserted by Plaintiffs Evans, Westbrook, and Blake, concluding the allegations do not establish a violation of their Fourth Amendment rights. With

40

respect to Plaintiffs Powell, Clemons, Middleton, Witherspoon, and Wolf, we conclude the allegations in the Complaint do establish a violation of their Fourth Amendment rights, and we consider in section II.B.2.a. whether the rights of these AR Group Plaintiffs were clearly established.

b. *Strip searches of AL and CR Group Plaintiffs*

We turn next to the constitutionality of blanket strip searches conducted on the AL and CR Group Plaintiffs after becoming entitled to release. Plaintiffs allege, with respect to the AL Group, the Jail has a practice of conducting blanket strip searches on detainees who have posted bond or who have been ordered released at a First Appearance hearing at the Jail. The AL Group Plaintiffs were subjected to the booking process, including the booking strip searches, after becoming entitled to release because their point-of-entry booking into the Jail was not started or completed upon their arrival at the Jail. We assume the AL Group Plaintiffs were subjected to strip searches as part of this late booking process because they were placed in the general jail population while the staff in the Records Room, as part of the release process, searched for other detention orders, warrants, and holds.[34]

---

[34]Plaintiffs do not challenge the late booking process as a whole. For example, Plaintiffs do not challenge the process during which a person committed to the Jail is fingerprinted, identified, and entered into the Jail's computerized inmate management system. Rather,

Plaintiffs also allege, with respect to the CR Group, the Jail has a policy of conducting blanket strip searches on persons who are returned to Jail following a court appearance at which they were ordered released, despite the fact that these "in-custody defendants" were under the constant supervision of the Sheriff's deputies, were not permitted to have contact with anyone while in transit or at the courthouse, and were already strip searched upon entering the Jail. The CR Group Plaintiffs were strip searched upon their return from the courthouse before being booked back into the general jail population, where they were held while the Records Room searched for outstanding detention orders, warrants, and other holds before releasing them. The CR Group Plaintiffs had already been strip searched once as part of their point-of-entry booking into the Jail and thus were subjected to blanket strip searches twice.

As with arrestee strip searches, the Supreme Court's reasonableness test articulated in *Bell* is the applicable standard to evaluate the strip searches of the AL and CR Group Plaintiffs. In each case, the test requires "a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in

Plaintiffs challenge the policy of conducting booking strip searches, as part of the late booking process, after they have posted bond or have been ordered released by a judicial officer at the Jail.

which it is conducted, the justification for initiating it, and the place in which it was conducted." *Bell*, 441 U.S. at 559, 99 S. Ct. at 1884.[35] This Court conducted such a balancing in *Wilson* and *Skurstenis,* explaining the "justification" prong of the *Bell* test and finding that strip searches of arrestees as they enter the Jail cannot be justified on the single ground that the arrestees will be placed in the Jail's general population. *Wilson*, 251 F.3d at 1342-43; *Skurstenis*, 236 F.3d at 682. Rather, under the law of this Circuit, an arrestee to be detained in the general jail population has a constitutional right under the Fourth Amendment to be free from strip searches conducted without reasonable suspicion that the detainee is concealing weapons, drugs, or other contraband. *Wilson*, 251 F.3d at 1341-43; *Skurstenis*, 236 F.3d at 678, 680, 682. Here, the justification is the same as in *Wilson* and *Skurstenis*, that is, continued detention in the general jail population. Additionally, the privacy interests of the AL and CR Group Plaintiffs are the same, or arguably greater than, those of arrestees because they are entitled to release and the basis for their detention at the Jail no longer exists.[36] Accordingly, if our precedent requires reasonable suspicion to justify point-of-entry strip searches of

---

[35]Because the AL and CR Group Plaintiffs do not challenge the scope, place, or manner of their strip searches, we address only the "justification" prong.

[36]We recognize that the AL Group Plaintiffs who posted bond still have charges pending against them.

arrestees bound for the general jail population, then at a minimum, reasonable suspicion must exist to justify strip searches of persons entitled to release from the Jail who are to be placed in the general jail population while their records are checked for other detention orders, warrants, or holds.  Therefore, we must deem unconstitutional the Jail's policies of conducting blanket strip searches on detainees who are entitled to release from the Jail under the factual circumstances presented here.

Although we conclude the Jail's policy is unconstitutional, we must determine whether reasonable suspicion existed to justify the particular strip searches of the AL and CR Group Plaintiffs.  We first discuss the two Plaintiffs in the AL Group, Powell and Matkin.  Because Powell posted bond, rather than having been ordered released, his arrest charge remained pending against him at the time he was strip searched.  Therefore, the nature of the offense for which he was arrested may give rise to reasonable suspicion to justify his strip search.  Powell was arrested on charges of "disorderly conduct" and failure to pay a "bar tab," neither of which are crimes of violence or involve weapons or drugs.  Thus, we conclude that Powell's strip search after having posted bond was not supported by reasonable suspicion based on the nature of the arrest charge alone.  Matkin, however, was ordered released by a judicial officer at the Jail.  According to the

Complaint, Matkin was arrested on March 18, 2004 on a charge of "aggravated assault"; on March 19, 2004, a judicial officer *at the Jail* dismissed the aggravated assault charge and ordered Matkin released; instead of being released, Matkin was booked into the Jail, strip searched, and held for four days; Matkin was permitted to leave the Jail only on March 23, 2004. Based on the allegations, we cannot say at this 12(b)(6) stage that Matkin's strip search was supported by reasonable suspicion.[37]

The two Plaintiffs in the CR Group, Evans and Wolf, had already been strip searched upon entering the Jail and were ordered released in state court. Thus, there were no pending charges against them at the time they were strip searched again, and we cannot look to the nature of their arrest charges to find reasonable suspicion. Further, according to the Complaint, the CR Group Plaintiffs were under constant supervision while in transit to and from the Jail and while at the courthouse, and they were not permitted to have contact with anyone other than the Sheriff's deputies and their attorneys. Plaintiffs make no allegations indicating

[37]*See supra* note 33.

they had an opportunity to acquire contraband during their transfers within the Jail or between the Jail and the courthouse.[38]

We therefore conclude that all Plaintiffs of the AL Group–Powell[39] and Matkin–and all Plaintiffs of the CR Group–Evans[40] and Wolf–have sufficiently alleged violations of their Fourth Amendment rights.  We proceed to determine whether their rights were clearly established in section II.B.2.b. below.

2.  *Clearly Established Law*

In determining whether a constitutional right is clearly established, "[t]he relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Saucier*, 533 U.S. at 202, 121 S. Ct. at 2156.  This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition."  *Id.* at 201, 121 S. Ct. at

---

[38]Because the allegations do not give rise to reasonable suspicion as required under our precedent, we need not determine what particular level of cause is necessary to justify the strip searches of the AL and CR Group Plaintiffs.  Further, at this 12(b)(6) stage, Defendants have had no opportunity to present evidence on, or respond about, whether there was constant supervision and no contact or, even so, whether there were opportunities to obtain weapons, other contraband, or items from which weapons could be made.

[39]As we concluded above, Powell's strip search upon being booked into the Jail, which was based on his second commitment to the Jail after his bond was revoked, also violated his Fourth Amendment rights.

[40]Although the strip search conducted on Evans upon being booked into the Jail did not violate his Fourth Amendment rights, *see supra*, his strip search after returning from a court appearance at which he was ordered released lacked reasonable suspicion and, under our precedent, violated his Fourth Amendment rights.

2156. The contours of the right must be sufficiently clear such that a reasonable official would understand that his conduct violates that right. *Hope*, 536 U.S. at 739, 122 S. Ct. at 2515. "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039 (1987) (citation omitted)). The salient question, therefore, is whether the state of the law gave the government official "fair warning" that his treatment of the plaintiff was unconstitutional. *Id.* at 741, 122 S. Ct. at 2516; *see also Marsh v. Butler County*, 268 F.3d 1014, 1031 (11th Cir. 2001) (en banc) (stating "fair and clear notice to government officials is the cornerstone of qualified immunity").

In most instances, "fair warning" will be given by case law existing at the time of the alleged violation. *See Vinyard*, 311 F.3d at 1351. In finding applicable case law, we look to decisions of the United States Supreme Court, decisions of this Court, and decisions of the highest court of the pertinent state. *Marsh*, 268 F.3d at 1032-33 n.10; *Hamilton v. Cannon*, 80 F.3d 1525, 1532 n.7 (11th Cir. 1996). In many instances, case law will announce a holding that is tied to a particular set of facts. *Vinyard*, 311 F.3d at 1351-52. When such fact-specific precedents are said to clearly establish the law, the circumstances in the instant

47

case facing the government official must be "materially similar" to those in the preexisting case law for us to conclude the government official had fair warning of the unconstitutionality of his conduct. *See id.* at 1352. However, although cases with materially similar facts can provide especially strong support for a conclusion that the law is clearly established, they are not always necessary. *Hop*e, 536 U.S. at 741, 122 S. Ct. at 2516. A governmental official can be on notice that his conduct violates the law even in novel factual circumstances. *Id.*; *see Vinyard*, 311 F.3d at 1351-52. Where case law announces broad principles of law that are not tied to particularized facts, such case law can clearly establish the law applicable in a variety of different factual circumstances. *Vinyard*, 311 F.3d at 1351. We have cautioned, however, that if a broad principle is to clearly establish the law applicable to a specific set of facts, "it must do so 'with obvious clarity' to the point that every objectively reasonable government official facing the circumstances would know that the official's *conduct* did violate federal law when the official acted." *Id.* (emphasis added).

a. *Strip Searches of AR Group Plaintiffs*

We first consider whether the Fourth Amendment rights of Plaintiffs Powell, Clemons, Middleton, Witherspoon, and Wolf of the AR Group were clearly established. This Court's panel decisions in both *Skurstenis* and *Wilson,* issued

48

before the strip searches in the instant case occurred, make clear that jailers are required to have reasonable suspicion of weapons, drugs, or other contraband before strip-searching arrestees bound for the general jail population. *Wilson*, 251 F.3d at 1343 (holding the strip search of the plaintiff absent reasonable suspicion, as well as Shelby County Jail's policy authorizing the strip search, were unconstitutional); *Skurstenis*, 236 F.3d at 682 (holding Shelby County Jail's policy of strip-searching inmates without reasonable suspicion was unconstitutional); *see also Cuesta v. School Bd. of Miami-Dade County*, 285 F.3d 962, 969 (11th Cir. 2002) ("This Court has explained the 'justification' prong of the *Bell* decision in two recent cases: *Skurstenis v. Jones* and *Wilson v. Jones*. Both cases make clear that the Fourth Amendment requires jail officials to have 'reasonable suspicion' that an arrestee is concealing weapons or contraband before they can perform a strip search." (citations omitted)).

Further, on at least two occasions, this Court has emphasized the holding of *Wilson*. In *Hicks*, for example, a panel of this Court addressed the constitutionality of a county jail's practice of strip searching every arrestee to be placed in the general jail population. Citing *Wilson*, we stated: "[G]iven the Circuit's precedent, we must conclude the search of Plaintiff cannot be justified under the Constitution on the single ground that Plaintiff was about to be placed in the Jail's general

49

population," and "we accept that reasonable suspicion is required by the law of this Circuit." *Hicks*, 422 F.3d at 1251. In *Evans I*, we again recited the holding of *Wilson*: "Arrestees who are to be detained in the general jail population can constitutionally be subjected to a strip search only if the search is supported by reasonable suspicion that such a search will reveal weapons or contraband." *Evans I*, 351 F.3d at 490. Accordingly, we conclude Sheriff Barrett had fair warning that the blanket strip searches conducted on the AR Group Plaintiffs were unconstitutional.

It is true, as the district court pointed out, that we have questioned our requirement of reasonable suspicion. *See Evans II*, 407 F.3d at 1278 ("Most of us are uncertain that jailers are required to have a reasonable suspicion of weapons or contraband before strip searching–for security and safety purposes–arrestees bound for the general jail population); *Hicks*, 422 F.3d at 1251 n.5 ("We personally question that such a practice violates the Fourth Amendment."). However, our questioning has been merely dicta, and we have previously recognized that dicta plays no role in the clearly established analysis: "The law cannot be established by dicta. Dicta is particularly unhelpful in qualified immunity cases where we seek to identify clearly established law." *Hamilton*, 80 F.3d at 1530. However, even if our dicta in *Evans II* and *Hicks* could be said to "muddle" the law of this Circuit, the

50

opinions in both cases were issued *after* the alleged strip searches in the instant

case occurred and thus could not have affected Sheriff Barrett.

We also disagree with the district court's conclusion that there is a

"pronounced dissimilarity" between the strip searches in *Wilson* and those in the

instant case such that *Wilson* could not have given Sheriff Barrett fair warning of

our requirement of reasonable suspicion. Specifically, the district court found the

strip searches alleged in the instant case were "markedly less invasive" than those

in *Wilson.* This ignores the allegations in the instant case that Plaintiffs were

required not only to remove their clothing but also to shower together with a group

of thirty or forty other persons. Each arrestee then either singly or standing in line

with others was visually inspected front and back. In *Wilson*, the plaintiff was

required to remove her clothing, "squat, spread her buttocks, and cough three

times." *Wilson*, 251 F.3d at 1341. The female officer in *Wilson* checked the

plaintiff's ears, mouth, nose, and breasts during the search. *Id.* at 1341-42. While

the strip search in *Wilson* and those in the instant case were conducted in different

manners, each was invasive and we cannot conclude that any difference in the

degree of invasiveness is material. Like the instant case, *Wilson* addressed strip

searches of arrestees to be placed in the general jail population without an

individualized finding of reasonable suspicion. *See id.* at 1341. Thus, while

51

*Wilson*'s holding is to a certain extent tied to the particular facts at issue, the pertinent facts of both cases are materially similar.[41]  Accordingly, we conclude Sheriff Barrett had fair warning that strip-searching the AR Group Plaintiffs absent reasonable suspicion violated their Fourth Amendment rights.

Because Plaintiffs Powell, Clemons, Middleton, Witherspoon, and Wolf sufficiently alleged violations of their Fourth Amendment rights, and because such rights were clearly established, we reverse the district court's dismissal of the strip search claims for monetary damages against Sheriff Barrett in her individual capacity.

### b.  *Strip Searches of AL and CR Group Plaintiffs*

We next consider whether the Fourth Amendment rights of Plaintiffs Powell and Matkin, of the AL Group, and Plaintiffs Evans and Wolf, of the CR Group, were clearly established.  The *conduct* challenged in the instant case–routine, indiscriminate strip searches–is the same as the conduct we addressed in *Wilson*. Further, in both *Wilson* and the instant case, the purported justification for the routine, indiscriminate strip searches was that the arrestees would be placed in the

---

[41]We note that *Wilson's* holding imposing a requirement of reasonable suspicion was in no way qualified by the manner in which the strip search was conducted.  However, because judicial opinions "cannot make law beyond the facts of the cases in which those decision are announced," we recognize that the holding is limited to a certain extent by the material facts presented to the Court.  *Watts v. BellSouth Telecomms., Inc.*, 316 F.3d 1203, 1207 (11th Cir. 2003).

general jail population. *Wilson,* 251 F.3d at 1341; *see also Hicks*, 422 F.3d at 1251. We concluded in *Wilson* that such a justification, alone, was not sufficient to justify the challenged conduct. *See Wilson*, 251 F.3d at 1341, 1343. To the extent the rule announced in *Wilson* was tied to particularized facts, we determine the facts of the instant case with respect to the AL and CR Groups are materially similar to the pertinent facts in *Wilson*.

The fact that the AL and CR Group Plaintiffs were not newly-admitted arrestees makes it even more obvious under *Wilson* that their strip searches were unconstitutional. They, unlike newly-admitted arrestees, were entitled to release from the Jail and, in case of those Plaintiffs ordered released either at the Jail or in state court, no longer had pending charges against them. Accordingly, we conclude Sheriff Barrett had fair warning, under this Circuit's precedent, that strip-searching the AL and CR Group Plaintiffs absent reasonable suspicion violated their Fourth Amendment rights.

Because the AL and CR Group Plaintiffs sufficiently alleged violations of their Fourth Amendment rights, and because such rights were clearly established, we reverse the district court's dismissal of their strip search claims against Sheriff Barrett in her individual capacity.

53

C. *Municipal Liability of the County and the City under § 1983*

The question of municipal liability under § 1983 is relevant only when a constitutional violation has occurred. *Rooney v. Watson*, 101 F.3d 1378, 1381 (11th Cir. 1996). Thus, we address the County's and City's liability under § 1983 only with respect to those Plaintiffs who have sufficiently alleged violations of their Fourth Amendment rights, namely Plaintiffs Powell, Middleton, Witherspoon, Matkin, Wolf, and Evans.

"The Supreme Court has placed strict limitations on municipal liability under § 1983." *Grech*, 335 F.3d at 1329. A municipality can be found liable under § 1983 only where the municipality itself causes the constitutional violation at issue. *City of Canton v. Harris*, 489 U.S. 378, 385, 109 S. Ct. 1197, 1203 (1989). Thus, a plaintiff seeking to impose liability on a municipality under § 1983 must identify a municipal policy or custom that caused the plaintiff's injury. *Grech*, 335 F.3d at 1329. Because a municipality will rarely have an officially-adopted policy of permitting a particular constitutional violation, most plaintiffs must show the local government has a custom or practice that evidences a "deliberate indifference" to the plaintiff's right. *See id.*; *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004). Only where the municipality's custom or practice reflects a "deliberate" or "conscious" choice from among various alternatives can the

54

municipality be liable for its conduct. *Harris,* 489 U.S. at 388, 109 S. Ct. at 1205.

However, it is not enough to identify conduct properly attributable to the

municipality. *Id.* A plaintiff must also demonstrate that the municipality's custom

is the "direct causal link" between the municipality and the constitutional injury

such that the municipality's action was the "moving force" behind the violation.

*Id.* at 385, 389.

Our decision today that Sheriff Freeman acts as an arm of the State

forecloses Plaintiffs' argument that the County can be held liable under § 1983

based on its control of the strip search policies at the Jail. As we previously

explained, the Sheriffs do not act as policymakers for the County when performing

their function of maintaining security at the Jail. *See Manders*, 338 F.3d at

1328; *Grech*, 335 F.3d at 1332.

However, plaintiffs identify another set of "policies" which they claim the

City and County do control, namely the County's and the City's policies of

committing arrestees to the Jail through their respective police departments. We

agree with the district court that, when read in the light most favorable to Plaintiffs,

the Complaint can be read to allege these other "policies." Nonetheless, as we

explain below, we conclude that Plaintiffs' claims of municipal liability against the

County and City for the violation of Plaintiffs' Fourth Amendment rights, even when based on these other "policies," fail.

1. *Liability of the City*

With respect to the City, not one of the Plaintiffs who sufficiently alleged a violation of their Fourth Amendment rights was arrested by the City of Atlanta Police Department. There are no constitutional injuries attributable the City, therefore, because the City did not place at the Jail any of the Plaintiffs who sufficiently alleged constitutional injuries. Because the City did not violate the constitutional rights of these Plaintiffs, Plaintiffs' strip search claims against the City under § 1983 must be dismissed. *See Rooney*, 101 F.3d at 1381 (explaining that inquiry into a governmental entity's custom or policy is relevant only when a constitutional deprivation has occurred).

2. *Liability of the County*

With respect to the County, Plaintiffs claim the County "knew or should have known" of the unconstitutional strip searches and were "deliberately indifferent" to Plaintiffs' rights "to be free from illegal strip searches." Plaintiffs allege the County's deliberate indifference was the "moving force" or "motivating factor" behind Plaintiffs' constitutional injuries. Although Plaintiffs allege that the County was "deliberately indifferent," we question whether the County's

commitment of arrestees at the Jail was in fact a "deliberate choice from among various alternatives." In fact, unlike their allegations about the City, Plaintiffs do not specifically allege that the County has a choice over where to commit its arrestees.

Even assuming, however, the County's placement of arrestees at the Jail constitutes a policy that reflects a deliberate indifference to Plaintiffs' Fourth Amendment rights, this case presents additional problems of causation. The link between the County's policy of placing arrestees at the Jail and the strip searches conducted at the Jail by the Sheriff and his deputies–over which the County has no control–is too attenuated to impose liability on the County. *See Turquitt v. Jefferson County*, 137 F.3d 1285, 1292 (11th Cir. 1998) ("[L]ocal governments can never be liable under § 1983 for the acts of those whom the local government has no authority to control."). We recognize that had the County not placed its arrestees at the Jail, those persons would not be subjected to the strip searches at the Jail; but we cannot say, based on Plaintiffs' allegations, that the County's placement of arrestees at the Jail was the direct causal link or the moving force that animated the behavior of the Sheriffs and their deputies that resulted in the constitutional violations alleged. "Obviously if one retreats far enough from a constitutional violation some municipal 'policy' can be identified behind almost

57

any . . . harm inflicted by a municipal official." *Oklahoma City v. Tuttle*, 471 U.S. 808, 823, 105 S. Ct. 2427, 2436 (1985) (plurality opinion). For example, Plaintiffs would never have been committed to the Jail if the County did not have a "policy" of arresting state offenders, and Plaintiffs would never have been arrested, if the County did not have "policy" of establishing a police force. *See id.* But the Supreme Court's rigorous standards of culpability and causation that apply where a municipality's actions are facially valid require more, which Plaintiffs have failed to show. *See Harris*, 489 U.S. at 388, 109 S. Ct. at 1205. Plaintiffs' conclusory statement that the County was the "moving force" behind Plaintiffs' injuries does not cure this defect. *See Twombly,* 127 S. Ct. at 1964-65 (requiring more than a formulaic recitation of the elements of a cause of action to survive a motion to dismiss). We therefore reverse the district court's denial of the County's and City's motions to dismiss.[42]

### III. CONCLUSION

Based on the foregoing, we affirm the district court's dismissal of the strip search claims for monetary damages against Sheriff Freeman in his official capacity; we affirm in part and reverse in part the district court's dismissal of the

---

[42]We note that Plaintiffs do not argue on appeal the County was deliberately indifferent based on its failure to train the Sheriffs and their staff.

58

strip search claims for monetary damages against Sheriff Barrett in her individual capacity; we reverse the district court's denial of the County's and the City's motions to dismiss Plaintiffs' strip search claims; and we remand for the district court to dismiss Plaintiffs' strip search claims for monetary damages against Sheriff Freeman in his individual capacity and Plaintiffs' strip search claims for injunctive relief against Sheriff Freeman in his official capacity.

After remand consistent with our instructions, only the strip search claims for monetary damages asserted by Plaintiffs Powell (both his AR and AL Group claims), Clemons, Middleton, Witherspoon, Wolf, Matkin, and Evans (only his CR Group claim) against Sheriff Barrett in her individual capacity will remain.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED IN PART.**

Appendix:

**AR GROUP**
*Blanket strip searches as part of point-of entry booking into the Jail*

| Name | Charge |
|---|---|
| C. Alan Powell | Bond revocation on charges of disorderly conduct and failure to pay a bar tab |
| David Evans | Disorderly conduct, weapons warrant |
| Stanley Clemons | Burglary |
| Alan Middleton | Traffic ticket warrant |
| Anthony Westbrook | Simple battery, child abandonment (non-support), forgery probation warrant |
| Benjamin Blake | Battery, trespass, obstruction |
| Harry Witherspoon | DUI |
| Antionne Wolf | Contempt/non-payment of child support |

**AL GROUP**
*Blanket strip searches of detainees who posted bond or were ordered released at the Jail before their point-of-entry booking into the Jail was started or completed*

| Name | Charge | Reason for Release |
|---|---|---|
| C. Alan Powell | Disorderly conduct, failure to pay a bar tab | Posted bond at the Jail |
| Kristopher Alan Matkin | Aggravated assault | Charges dismissed by judicial officer at the Jail |

**CR GROUP**
*Blanket strip searches of detainees upon returning from a court appearance after having been ordered released in state court*

| Name | Charge |
|---|---|
| David Evans | Disorderly conduct, weapons warrant |
| Antionne Wolf | Contempt/non-payment of child support |